## LESLIE WEBB V. STATE

No. 28,084. February 29, 1956.

Appellant's Motion for Rehearing Overruled
May 30, 1956.

Appellant's Second Motion for Rehearing Overruled
(Without Written Opinion) June 27, 1956.

*W. D. Brown,* Quitman, *James Cantwell,* Mineola, *Looney Lindsey* and *Hollie G. McClain,* Gilmer, for appellant.

*James L. Hartsfield,* County Attorney, *Howard C. Douglas,* Assistant County Attorney, Quitman, *J. O. Duncan,* County Attorney, Gilmer, and *Leon Douglas,* State's Attorney, Austin, for the state.

MORRISON, Presiding Judge.

The offense is murder; the punishment, death.

On a prior appeal (Webb v. State, 161 Tex. Cr. Rep. 442, 278 S.W. 2d 158), a death penalty conviction against this appellant was reversed because evidence was heard on a motion to quash the indictment in the absence of the accused. We also dismissed the indictment because it had been returned by a grand jury selected at an unauthorized term of court. Appellant was again indicted, venue was changed, he was again given the death penalty and is again represented in this court by the same able and conscientious court-appointed counsel who represented him on the prior appeal.

Jim Robinson, a farmer, was found dead in his pasture near where he had been burning brush. He had been shot

through the head with a small caliber bullet. His body had sustained other injuries which need not be recounted here. Appellant's father, testifying for the state, stated that he and appellant had gone hunting together in a wooded area approximately one-half mile from where Robinson's body was found on the day in question, that the appellant was armed with a .22 rifle, that they separated and he went home. He stated that the appellant returned home some hour and a half later, still carrying the rifle.

Fired cartridge cases found near the body, together with the appellant's rifle, were submitted to the Texas Department of Public Safety, and Firearms Examiner Rhymer testified that in his professional opinion the cartridges had been fired from the submitted rifle.

Appellant's confession was introduced in evidence, which relates how he shot Jim Robinson, took his pocketbook, carried it some distance from the body, removed the money therefrom, threw away the pocketbook, went on home and told no one of his deed.

Following the making of the confession, the appellant lead the officers to the spot where he had thrown it away, and they recovered the pocketbook, together with papers bearing deceased's identification.

The appellant did not testify in his own behalf.

Lay witnesses testified that the appellant was insane or of subnormal intelligence. The state called witnesses who expressed the opinion that the appellant was sane.

This, we think, is a fair summary of a 550-page statement of facts.

The jury resolved this conflict in the evidence as to the appellant's sanity, and we find the evidence sufficient to support their verdict.

We shall discuss the contentions of the appellant so ably presented by brief and in oral argument.

During the cross-examination of the deceased's son, he was questioned about the report he had received from his stepmother that the deceased had not returned from the pasture,

which initiated the search that culminated in the finding of the body of the deceased. We quote the following portion of the statement of facts from appellant's brief:

"Q. (By Mr. Lindsey, For the Defense). Now Son, you saw Mrs. Robinson—I believe you stated right before you went down there, I want to ask you to describe her condition to this jury, what was she doing? A. Well, not anything.

"Q. Was she crying? A. No, sir.

"Q. Did she seem highly nervous?

"Mr. Florence (For the State) : We object to that as calling for an opinion and conclusion on the part of this witness; wholly immaterial and irrelevant.

"The Court: If counsel will state to me his purpose now, it might be possible that it is material. If you will state to me why you think it is material, I will have something to judge it on.

"Mr. McClain (For the Defense) : Your Honor, it should be apparent that more people may be involved in this case.

"Mr. Duncan (For the State) : We object to statement of counsel in the presence and hearing of the jury; ex parte statement.

"The Court: I will let him state it. State who, so I will know.

"Mr. McClain: Mrs. Rhodie Robinson.

"The Court: It is your contention that Mrs. Rhodie Robinson was implicated in the killing?

"Mr. McClain: Yes, sir.

"The Court: You expect to offer evidence to that effect?

"Mr. Lindsey: We expect to offer evidence. It may be—I won't say how—whether it is direct, but it is our expectation to offer evidence to that effect.

"The Court: All right. Overrule the objection. Go ahead."

The appellant did not object until the following morning and then asked for a mistrial.

It is urged that the court commented on the weight of the evidence and prejudged the appellant's defense in the eyes of the jury by the questions and comments shown above.

If the defense had not wanted to answer the court's questions within the hearing of the jury, which, under the state of the record, appear to have been necessary in order for the court to properly rule upon the objection, they should have advanced to the bench and privately stated their reason to the court. In the absence of a showing that they attempted to do so and the court refused to permit them, no reversible error is reflected by the bill. On the contrary, the court's ruling was against the state, whose objection to defense counsel being permitted to make the statement in the presence of the jury was overruled.

The appellant next contends that the confession is inadmissible as a matter of law because the sheriff showed the appellant pictures of the body of the deceased shortly before he signed the confession. We again call attention to the fact that the appellant did not testify, and there is no evidence of police brutality or long and uninterrupted questioning. The appellant, aged 29, was carried from his home county of Upshur to Austin, after he had agreed in writing to submit to the lie detector test. The tests were given, and he was returned to his home and released. Some several days later, after the officers had pursued their investigation further, a complaint was filed against the appellant, he was arrested and again carried to Austin, this time accompanied by his father, and again given the lie detector test. After D. E. Wheeler, the operator of the polygraph machine, had concluded this second test, he left the room where the test had been given, and the sheriff entered and began to talk to the appellant. It was at this time that the sheriff showed the appellant the pictures of the body of the deceased. After he talked to the sheriff, he signed a written confession. At this point we quote from the testimony of the sheriff:

"Just like I say, Hollie, I don't recall whether he had already started making his statement or had already explained to me what happened on that afternoon, whether I showed him the picture or not, but I think it was after he had told me about the killing of Mr. Jim."

As stated, it is the appellant's contention that, since the

sheriff admitted that the pictures made a "mighty gruesome sight," we should hold as a matter of law, without any testimony from the appellant, that such act on the part of the sheriff rendered the confession inadmissible.

Reliance is had upon U.S. v. Davis, 32 F. 2d 860, by the Ninth Circuit Court of Appeals. In that case, the accused was carried to the morgue at three o'clock in the morning and there interrogated for almost an hour in the presence of the body of his deceased victim.

In the case at bar, the accused was shown the pictures for a very short time later in the afternoon in the polygraph room at the Texas Department of Public Safety.

We cannot bring ourselves to hold that there is enough similarity in the facts of the two cases to make the Davis case here controlling. In the case at bar, the appellant's father had accompanied him to a public building where he was given the lie detector test. At the conclusion of the test, he was shown pictures of the body of the deceased, and during this interview he confessed. As shown by the sheriff's testimony quoted above (which was the only testimony on the question), the appellant failed to establish that the confession was induced by the pictures which were exhibited to him.

Appellant also relies upon the decision of this court in Prince v. State, 155 Tex. Cr. Rep. 108, 231 S.W. 2d 419. In the Prince case, we had undisputed evidence of long and uninterrupted questioning, which is held to vitiate a confession by this court and the Supreme Court of the United States. There is no such showing in the case before us.

We overrule appellant's contention in this respect.

Appellant's last contention, if we properly understand it, is that the court violated his State and Federal constitutional right in admitting the confession against him because it was secured following the giving of a lie detector test some distance from his home.

This court has rather recently had before it a similar contention in Gasway v. State, 157 Tex. Cr. Rep. 647, 248 S.W. 2d 942 (cert. den. 344 U.S. 874; 73 Sup. Ct. 167; 97 L. ed. 677), Paris v. State, 249 S.W. 2d 217 (cert. den. 344 U.S. 857, 73 Sup. Ct. 92, 97 L. ed. 665), and in Hulen v. State, 157 Tex. Cr. Rep.

507, 250 S.W. 2d 211. The record in those cases and the record before us here lead us to conclude that the use of the lie detector test as a means of interrogation does not violate the accused's constitutional rights or render the written confession thereafter made involuntary.

Finding no reversible error, the judgment of the trial court is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING

WOODLEY, Judge.

In view of appellant's motion for rehearing a further statement of the facts is deemed necessary.

As stated in the original opinion, Jim Robinson (the deceased) was found dead in his pasture where he had been burning brush.

The area where the body was found had burned and the body was on fire. It was still burning in the abdominal area when the doctor arrived, but the face and head were burned very little and the doctor had no difficulty in recognizing the deceased by the light of a brush fire which was burning nearby.

The doctor testified that the body was badly burned in the portion from the neck to the lower part of the leg, for which reason his examination of the body was principally confined to the head.

The only injury to the head then observed was a small hole or opening at the hair line of the left temple. Post mortem examination proved this to be the point of entry of a bullet which was found in the brain.

It was the doctor's opinion that the bullet wound or the burns which ever occurred first was the cause of death, and that the bullet wound was such as would cause instant death.

The physical facts mentioned called for an investigation to be conducted not only to determine who fired the shot into Jim Robinson's brain, but also how and why his body was burned.

Upon the second trip to Austin and at the conclusion of the polygraph test, the sheriff came to the room where the test was

made, as he understood it, in answer to the request of appellant. Others were in the adjoining room which was so equipped that they could see and hear what was transpiring or being said in the room where the sheriff and appellant were.

On cross-examination of the sheriff it was developed that during the conversation at this time, appellant told him everything that was in the written statement thereafter admitted in evidence "and possibly a little more."

The sheriff testified on such cross-examination that he was "trying to get a confession out of him" and that he was "trying to see if he burned the body also," and that he exhibited to appellant a picture of the "charred body of Jim Robinson," which he described as "a mighty gruesome sight." The picture was not produced and is not in the record.

The sheriff was asked and answered on said cross-examination: "Had you shown him the picture before you told him to tell the truth or after you told him to tell the truth? A.   Just like I say, Hollie, I don't recall whether he had already started making his statement or had already explained to me what happened on that afternoon, whether I showed him the picture or not, but I think it was after he had told me about the killing of Mr. Jim."

The confession as made orally to the sheriff was made also to the county attorney after the statutory warning and was reduced to writing, and signed. Appellant admitted that he shot and killed Jim Robinson and robbed him of his pocketbook containing $30, but at no time did he admit that he burned the body. The burning is unexplained except as may be inferred from the fact that the deceased was engaged in burning brush and the area where the body was found was burned over. It was for this reason that the burning was not discussed in our original opinion.

Appellant urges that in exhibiting the picture to appellant the sheriff violated Art. 1157 of the Penal Code, and thereby obtained the confession reduced to writing and also the oral confession which led to the finding of the pocketbook taken from the person of the deceased.

The court, in his charge, instructed the jury that the statement in writing, allegedly made by appellant, was not to be considered for any purpose unless it was freely made without

compulsion or persuasion and after the warning therein set out had been given, and that if made as a result of threats or violence used toward appellant, or by compulsion or persuasion, it was not to be considered.

The objections and exceptions to the court's charge contain no complaint as to such instruction, or of the omission of further instructions, and no additional charge was requested.

The record shows no bill of exception, formal or informal, setting forth that either confession was admitted over the objection that the same was obtained or induced by the act of the sheriff in exhibiting the picture of the body of the deceased.

The oral confession made after the defendant had been returned to Gilmer and which led to the recovery of the pocketbook taken from Jim Robinson in the robbery was admitted before there was any evidence relating to the showing of the picture by the sheriff.

When the written confession was offered counsel for the appellant stated that they wanted to file a motion to suppress it "and we will let the testimony heretofore that we have introduced go to our motion for the court to consider in either sustaining or overruling it but we would like to get it in the record at this time."

"The Court: Overrule the motion."

There appears in the transcript a motion to suppress all confessions.

Not only is such procedure foreign to this state, but there is nothing in the record to show that this motion was presented to the court and ruled on by him.

If we may assume that this was the ground upon which appellant relied to have the confession excluded, then such issue as was raised was submitted to the jury with instructions to disregard the confession signed by appellant unless it was freely made, without compulsion or persuasion and not as a result of threats or violence.

It is also significant to note that after verdict motion for new trial was filed containing several grounds upon which the court was asked to set aside the verdict, none of which directly

or indirectly attacked the admissibility of either of the confessions admitted in evidence.

As has been stated, the evidence shows no "long gruelling questioning of appellant" and the contention that the confessions were inadmissible under the undisputed facts rested alone upon the fact that after the polygraph test had been completed the sheriff entered the room, and while endeavoring to obtain a confession and to determine whether appellant burned the body after killing and robbing the deceased, showed appellant a picture of the charred body which the sheriff testified was "a mighty gruesome sight."

What effect the picture had upon appellant is not disclosed in the record. We know that he thereafter, and the sheriff thought he had also previously, confessed that he killed and robbed Jim Robinson, and that he led the officers to the missing pocketbook. Also we know that he did not confess to or implicate himself in the burning of the body, and did not testify at the trial.

It is here contended that the confessions so admitted were inadmissible as a matter of law and we are asked to reverse and order a new trial because of their admission, and this despite the fact that no such ground for new trial was presented to the trial court, and no sufficient objection specifying such ground appears in the record, unless it be the motion to suppress above mentioned.

We cannot subscribe to the view that the undisputed evidence shows that the sheriff, in exhibiting the picture to appellant, tortured, tormented or punished his prisoner by inflicting upon him mental pain and that he did so for the purpose of making or attempting to make appellant confess to a knowledge of the commission of an offense, in violation of Art. 1157, V.A.P.C. At most, the evidence but raised such issue, and we are not prepared to say that it is sufficient to support a finding that the sheriff violated said statute.

Nor can we agree that the undisputed evidence shows that as a matter of law the confessions were rendered inadmissible because they resulted from the conduct of the sheriff in exhibiting the picture to appellant, and were therefore involuntary.

That the conduct of the sheriff induced or caused appellant to confess is not shown by undisputed evidence. Neither is it

shown that any influence or affect on appellant's mind which may have been caused from seeing the picture continued to the time the oral confession was made which led to the finding of the missing pocketbook.

In Colley v. State, 143 Tex. Cr. R. 390, 158 S.W. 2d 1014, it was held that where the officer violated Art. 1157 P.C. "if as a result of such violation of the law said person does confess, proof thereof becomes inadmissible * * * even though in connection with such confession the person should make statements found to be true, and which conduce to establish his guilt."

Whether the confessions and each of them resulted from the sheriff showing appellant the picture was a fact issue. If it did so result the confessions could not have been freely made without compulsion. This issue was properly submitted to the jury in the court's charge.

We remain convinced that the recent cases cited in our original opinion, in which certiorari has been denied by the Supreme Court of the United States, correctly hold that the use of the so-called lie detector test as a means of interrogation, such as here shown, does not render the confession thereafter made involuntary and that the undisputed facts before us do not condemn the confessions as a matter of law.

An examination of such cases, as well as those cited therein, will make apparent the fact that this court has consistently given application to the rule of the Supreme Court of the United States in cases involving alleged involuntary confessions.

The confessions and the evidence independent of the confessions clearly prove that appellant killed and robbed the deceased. His plea of insanity has been twice rejected by a jury, and in both trials the extreme punishment was assessed

We find no error in the record which would justify a reversal of the conviction and appellant appears to have been accorded all of his legal rights.

DAVIDSON, Judge dissenting:

Upon re-examination of the facts, I have come to the conclusion that the confession of the appellant was not admissible and that its introduction in evidence was violative of the Con-

stitution and statute law of this state and also of the due process clause of the Fourteenth Amendment to the Federal Constitution as applied by the decisions of the Supreme Court of the United States.

The deceased resided with his wife on a farm near Gilmer, Texas. On the morning of February 26, 1954, he was engaged in burning some brush in a field a short distance from the residence. He returned about noon for lunch. At that time his wife turned over to him twenty dollars in currency which had been left with her by Kermit Spann for him. Deceased went back to the field that afternoon. When he did not return from work at the usual time, his wife became alarmed and started in search for him. Not being able to find her husband in the field, she went to the residence and then to the home of a neighbor, to whom she communicated the fact that she feared something had happened to him. She requested that a son of the deceased, who resided in Gilmer, be notified of her apprehension.

As a result, a nephew of the deceased and the son and others appeared at the home. A search was instituted, and the burned, charred body of the deceased was found in a wooded area there on the farm, the mid-section of the body being especially badly burned.

No attempt was made at the trial to explain how the fire was communicated to the body.

When found, the body was from 150 to 200 yards from any burning brush pile.

An autopsy was attempted, but was ineffective further than to show that deceased had been shot in the head with a small caliber firearm.

Two days after the body was discovered, appellant, a twenty-nine-year-old illiterate, weak-minded Negro man who lived with his father in Gilmer, was arrested by being summoned by the sheriff to come to the office of the county attorney. Appellant answered the summons and was questioned at that time for some thirty or forty minutes by the county attorney. The context of any statements he made was not revealed. It is sufficient to say that appellant was released upon his agreement to accompany the officers to Austin, where he would subject himself to a "lie detector" test. Two days thereafter, on March 2, 1954, the sheriff and the county attorney took him to Austin,

a distance of 280 miles, where he was given the lie detector test by an operator at the Texas Department of Public Safety. The test consumed something like two hours, after which the three parties returned to Gilmer and appellant was released from custody and permitted to return to his home.

The state strenuously objected to proof of the result of the lie detector test for any purpose or reason.

Three days thereafter, on March 5, 1954, appellant was again arrested and placed in jail.

The following day the county attorney took a statement from appellant, the contents of which were not revealed.

On March 11, 1954, appellant was again taken to Austin by the sheriff to undergo another lie detector test. The county attorney and the editor of a Gilmer newspaper accompanied them. Appellant's father was also taken along. At Austin, appellant agreed to take the test which, on this occasion, consumed less than an hour.

Again, the state prevented the result of this test from being known.

After completion of the test, the sheriff was left alone with the appellant for a time. According to the sheriff's testimony, he talked with appellant a while and then showed and displayed to him a picture of the burned and charred body of the deceased, which the sheriff admitted was a "mighty gruesome sight." Almost immediately after the picture had been exhibited to appellant he agreed to make a confession. This he did, to the county attorney, while they were yet at the Texas Department of Public Safety.

Immediately after the confession had been given, all parties returned to Gilmer.

It is significant to note the testimony of the sheriff as to his purpose in exhibiting the picture to the appellant, as follows:

("Q. * * * Did you have some reason for showing him the picture, Mr. Watson?) A.   Yes, sir.

"Q.   What was it? A.   I was trying to clear up what I thought was a murder case.

"Q. Was that the way to clear up a murder case? A. I was trying every angle.

"Q. What you were trying to do was get a confession? A. I was trying ever-angle.

"Q. Answer that question, weren't you trying to get a confession out of him at that time? A. Certainly."

The confession was received in evidence over the strenuous objection of appellant's counsel.

It would serve no useful purpose to here set forth the confession. For instant purposes it is deemed sufficient to say that appellant therein admitted killing the deceased by shooting him with a .22 caliber rifle while deceased was in a wooded area of his farm, that the motive for the killing was robbery, and that, after the shooting, he took a purse containing thirty dollars in currency from the body of deceased.

Nowhere in the confession did the appellant say anything concerning setting the body on fire or that there was a fire in the vicinity of the spot where the deceased fell. He said that he fled from the scene immediately after the shooting.

If there be any particular facts which stand out above others, they are as follows:

Appellant did not implicate himself in the killing until after the sheriff had exhibited to him the gruesome picture of the burned and charred body of the deceased. Up until that time, the necessary inference to be indulged is that in none of the questioning and statements prior thereto had the appellant implicated himself and that the lie detector tests were negative.

The other significant fact is that some one burned the body of the deceased. The confession of the appellant which the state offered in evidence, and thereby vouched for the truthfulness thereof, exculpated appellant from any connection with the burning. According to the confession, he could not have burned the body of the deceased.

If there were removed from this record the confession and the evidence obtained as a result thereof, serious doubt would exist as to whether there remained sufficient evidence to warrant appellant's conviction.

The importance of the confession to the state's case cannot be doubted.

There are those who insist that the polygraph or socalled lie detector test has been established as a reliable medium for ascertaining when a subject is testifying truthfully or falsely. The test is now being used extensively by law enforcing agencies.

The fact that when appellant sought to introduce the result of the two tests to which he was subjected the state strenuously objected thereto strongly suggests that the result of the tests was not beneficial to the state's case. That the state may have had the right to object, as it did, does not change the implication that must of necessity exist as a result of that objection, especially when the appellant was seeking to have that result in evidence before the jury or the court.

It is by reason of all these facts that the appellant insists that the confession was obtained as a result of psychological or mental coercion.

The Supreme Court of the United States recognizes that the use of a confession obtained as a result of mental or psychological coercion is forbidden by the Fourteenth Amendment to the Federal Constitution. Leyra v. Denno, 347 U.S. 556, 98 L. Ed. 984, 74 S. Ct. 716.

There is no question but that this court is bound by the decisions and conclusions of the United States Supreme Court touching the receipt in evidence of confessions in the trial of state criminal cases as being violative of due process of law. In the case of Prince v. State, 155 Tex. Cr. R. 108, 231 S.W. 2d 419, we had occasion to write upon the subject and to list the cases by that court wherein confessions of the accused in state court trials had been held to be inadmissible as being in violation of due process.

I am much impressed with the similarity between the instant case and that of Ward v. Texas, 316 U.S. 547, 62 S. Ct. 1139, 86 L. Ed. 1663, cited in the Prince case, especially wherein it is shown that what was done with and to the accused was all for the admitted purpose of extracting a confession from him, which was successfully accomplished.

I am convinced that under the decisions of the Supreme Court of the United States the instant confession was not ad-

missible in evidence. So believing, I have no right to refuse to follow those decisions. Whether I believe the holding of the Supreme Court of the United States to be correct or not is of no consequence. The sole question for my determination is whether the decisions of that court furnish a precedent showing the confession in this case was not admissible. It is my opinion that they do furnish such precedent. It is my duty to follow that precedent.

Not only do the decisions of the Supreme Court of the United States show that the confession was inadmissible but, I am also of the opinion, such is the conclusion that should be reached under the Constitution and laws of this state.

The United States Supreme Court is not alone in its conclusion that mental coercion might vititate and render a confession inadmissible. The legislature of this state entertains the same view and has, in effect, so stated by Art. 1157, P.C., and Art. 727a, C.C.P.

By Art. 1157, P.C., it is made unlawful for a sheriff to torture, torment, or punish a prisoner in his custody by inflicting mental pain upon him for the purpose of making or attempting to make such person confess to any knowledge of a violation of the law.

Art. 727a, C.C.P., says that any evidence obtained in violation of the laws of this state shall not be admitted in evidence against the accused on the trial of any criminal case.

In Colley v. State, 143 Tex. Cr. R. 390, 158 S.W. 2d 1014, this court gave effect to the statutes mentioned and there held that where Article 1157, P.C., had been violated in obtaining a confession such confession was not admissible in evidence— and this, notwithstanding the probability that facts may have been ascertained by and as a result of the confession which would conduce to establish the guilt of the confessor. See, also, Abston v. State, 132 Tex. Cr. R. 130, 102 S.W. 2d 428.

Here, the evidence does not suggest the application of physical violence to or pain or torture upon the appellant. Appellant does insist, however, that the facts abundantly establish that he was subjected to mental torture and pain, as a result of which he made the confession, but for which he would not have done so.

There appears no fixed definition as to the meaning of the term "mental pain," as used in Art. 1157, P.C.; obviously there could be none because the facts in each particular case would necessarily determine the question.

In arriving at a determination of what constitutes mental pain, I am particularly impressed with what was said in Stein v. New York, 346 U.S. 156, 73 S. Ct. 1077, 97 L. Ed. 1522, wherein we find this language:

"The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal."

Obviously, then, in order to determine whether the instant confession was obtained as a result of mental pain, the mental condition of appellant, the setting under which the confession was made, and the facts leading up to that situation must be looked to. With that observation in mind, we notice again these pertinent facts:

Soon after the body of deceased was found, appellant was called upon to explain his whereabouts to the county attorney. While the record does not say that at that time he protested his innocence, the necessary inference to be indulged is that he did, because the sheriff requested his consent to take a lie detector test. Unless appellant had protested his innocence, there would hardly have been occasion for the sheriff to suggest that he take such test.

In custody of the sheriff, the appellant was carried a distance of 280 miles to Austin, where the lie detector test was given him. This test must have been negative and in keeping with appellant's claim of innocence, because, upon returning home, he was unconditionally released from custody.

Following that release, he was again arrested, and questioned by the county attorney, and asked to take another lie detector test. Upon assent, he was again conveyed to Austin. This time, the editor of the local newspaper was along, in addition to the county attorney and appellant's father.

More questioning and another lie detector test followed. The

record is absolutely silent as to whether a different result from the other questioning and test was obtained.

In any event, the sheriff, alone with the appellant, took over the questioning, during which he confronted appellant with the gruesome picture of the burned, charred body of the deceased whom he was charged with having killed. It was only under such circumstances that appellant made the confession.

I cannot bring myself to the conclusion that this twenty-nine-year-old illiterate, weakminded Negro man, did not suffer, under the circumstances mentioned, at the hands of the sheriff that mental pain which Art. 1157, P.C., says precludes a valid confession.

I am fortified in that conclusion by the holding in the cases of Perrygo v. United States, 32 Fed. (2) 181, and Davis v. United States, 32 Fed. (2) 860, upon the proposition that the exhibition of the picture of the body of the deceased, under the circumstances, constituted mental pain and torture.

Throughout the consideration of this case, there constantly reverts to my mind the question: Who set fire to and burned the body of the deceased? Appellant's confession, which the state relies upon as being true, absolutely precludes the idea that appellant did so or was connected therewith. Not only is that true, but the body of the deceased was burning and still on fire when first discovered, several hours after the time appellant fixed in the confesssion that he shot the deceased, immediately after which he fled from the scene of the shooting.

Of necessity, the presumption must attain that the person responsible for the deceased's death set fire to and burned the the body.

According to the confession, which, by its introduction in evidence, the state says is true, appellant did not and could not have burned the body. So, in one breath, the state says that the confession is true insofar as the killing is admitted but that it is not true wherein appellant is exonerated of the burning of the body.

But the above inconsistency is no more imponderable than is that wherein the state is cast in the position of saying that a lie detector test is sufficiently reliable to warrant its use in criminal matters so long as the result is favorable to the state's

case but that it ceases to have that reliable aspect when it is favorable to the accused.

On motion for rehearing, the majority opinion suggests that the record in this case might be insufficient to authorize this court to review the validity of the confession. If my brethren want to dispose of this question because of some technical failure to follow some procedural matter, such is their province. But I want no part of it.

The facts speak for themselves, and are before us. As the facts show that this confession was obtained in violation of the Constitution and laws of this state and of the United States and appellant has been denied due process of law, this court should not permit the conviction to stand, regardless of some procedural rule not being followed in bringing the matter before this court.

Being convinced that the confession of appellant was inadmissible both under the decisions of the Supreme Court of the United States and under the Constitution and laws of this state, I respectfully dissent to the affirmance of this conviction.