[Crim. No. 5956. Second Dist., Div. One. Oct. 23, 1957.]

THE PEOPLE, Respondent, v. ARTHUR ARAGON, Appellant.

Jules J. Covey, Covey & Covey and Paul Caruso for Appellant.

Edmund G. Brown, Attorney General, William E. James and Morris Schachter, Deputy Attorneys General, for Respondent.

FOURT, J.—This is an appeal from an order denying the defendant's motion for a new trial and from a "probation order" denying probation to the defendant.

The defendant was accused in an indictment by the grand jury of Los Angeles County of a violation of section 337b, Penal Code, in that he did, in substance, about December 7, 1956, unlawfully offer to give a sum of money to Dick Goldstein with the intention and understanding that Goldstein would not use his best efforts to win a certain boxing contest, in which contest each of them was to participate, and with the further understanding that Goldstein would so conduct himself as to assist and enable Aragon to win the boxing event. The defendant was found guilty by a jury and thereafter made a motion for a new trial upon all of the statutory grounds which such motion was denied. Probation also was denied although recommended by the probation officers (because, as the judge said, the defendant "fails to recognize that he has a problem," and because the defendant, after the verdict, in a letter, stated, "I deny I offered him money to lay down to me"), and the defendant was thereupon sentenced to the state prison for the time prescribed by law.

A substantial résumé of the facts as developed by the evidence is as follows: Aragon has been a professional prize fighter for about 14 years, and has had about 100 fights, losing fifteen or seventeen and winning over 50 of them by knockouts. On December 7, 1956, he was rated number three in the welterweight division. Aragon was scheduled to fight an unrated colored boxer by the name of Tyler in San Antonio, Texas, on December 18, 1956. After the fight had been scheduled the promoters determined that under the circumstances as they then existed in Texas, Tyler would not be a suitable opponent. Tyler thereupon was cancelled out as a contestant for that occasion. It appears that Willie Ginsberg, who has to do with a gymnasium in Los Angeles, was contacted by the Texas promoters for assistance or suggestions in securing a replacement of Tyler as an opponent for Aragon for the fight on the 18th of December. Apparently Ginsberg contacted Aragon with reference to the matter. Aragon stated that Ginsberg told him that Goldstein would be his opponent.

Richard Goldstein was a part-time employee in a liquor store and part-time prize fighter, and former part-time sparring partner of Aragon, of the same weight class. He stated that on December 7th, Aragon called him on the telephone and talked to him about the fight. On direct examination he said that Aragon asked him if he would like to fight him in Texas and make some money for Christmas, and that he, Goldstein, replied that he would like it, and that Aragon then said, "Remember one thing. You have to go out in four rounds." On cross-examination Goldstein stated that Aragon told him in the telephone talk that the fight with Tyler was off and that he inquired if he, Goldstein, would like to take the fight and he, Goldstein, said that he would and was then told by Aragon to come out to his house in North Hollywood and they would talk it over. On further cross-examination of Goldstein the question was put to him: ". . . On the telephone he didn't say anything about a fix or bribe or dive or third or fourth round, is that correct?" and Goldstein answered, "Nothing." Later Goldstein testified that he did not recall anything about a fourth round being mentioned in the telephone talk and that he did not recall that anything was said about "taking a dive" in the telephone talk. It was also brought out that the witness had testified to still another version of the telephone conversation when he was before the grand jury.

Goldstein arrived at Aragon's house about 2 o'clock p. m., December 7th, with a woman friend, Beverly Ibarra. The two men went into one of the bedrooms where a conversation took place between them. The versions of what was said in the bedroom are as varied as the versions of the telephone conversation. Goldstein stated, however, among other things, that Aragon told him in the bedroom that, "Only on one occasion I would take the fight—when you go out in four rounds." Goldstein further stated that Aragon told him that he, Goldstein, would receive $750 from the promoters, and that Aragon would "take good care" of him, and that they would make lots of money together. In answer to such comments Goldstein stated that he said, "OK." Goldstein was then supposedly told by Aragon to see Willie Ginsberg of the gymnasium to get the address where he was to send his newspaper clippings and pictures in San Antonio for advertisement purposes. The next day Goldstein sent certain clippings to Sam Slotsky, in San Antonio, and Goldstein stated that on the same day in the gymnasium in Los Angeles Aragon passed him and held up four fingers. Goldstein went to Bob Borish, an agent of the Federal Bureau of Investigation in Los Angeles and had a talk with him. Borish, however, was not called as a witness by either side and did not testify at the trial.

Between December 7, 1956, and December 14, 1956, Goldstein and Aragon had several conversations. Goldstein stated that on December 13th, about 4:30 o'clock p. m., he and Aragon met Mrs. Sylvia Lierman on Fourth Street near its intersection with Main Street, in the city of Los Angeles. At that particular point Fourth Street was a one-way street. Mrs. Lierman was employed at a nearby bank and was just getting off from work. Although it was during the Christmas holiday season and during the traffic rush hours, Goldstein said that he and Aragon parked the automobile they were in on Fourth Street for about five minutes and Mrs. Lierman entered the car, whereupon Aragon gave her cab fare to go home because Goldstein intended to drive Aragon out to his North Hollywood home. Goldstein testified on direct examination that Aragon then said, "Kid, this time I give you five hundred only. Next time we make it lots of money together." On cross-examination the question was put, ". . . Can you tell me, sir, which day in December, 1956, if it was in December, 1956, Mr. Aragon first mentioned the $500 to you?" and Goldstein answered, "I believe it was in Texas. I don't recall.

Maybe he mentioned the same time in the car because he showed—he told me I would make lots of money when I stick with him. This time I only get so much and next time I will make it twice as much.''

There was another meeting at a Greek restaurant on Fourth Street where there were present Goldstein, Aragon and another fighter by the name of Kid Centella. Mrs. Lierman came to the restaurant later and had coffee with the group.

On Friday, December 14, 1956, Goldstein left Los Angeles for San Antonio by airline. The fare of $174 for the ticket was loaned to Goldstein by Aragon because Goldstein did not want to advance any money without a written contract. Goldstein arrived in San Antonio and was met by Sam Slotsky who, with Jimmy Parks, was a promoter of the fight in San Antonio. On Sunday, Goldstein went to stay at the Gunther hotel, where he had a room.

Aragon arrived in San Antonio on Saturday, the 15th of December, and stayed at a hotel some two blocks away from the Gunther hotel. Mr. Furiani, a manufacturer of furniture, of Los Angeles, traveled with Aragon and was staying with him. Goldstein, Aragon and Furiani met and had dinner together and talked about the fight. On Sunday, Aragon called Goldstein on the telephone and told him to come to his room and Goldstein complied. Goldstein later worked out in a gymnasium and saw Aragon there, where they supposedly had a short talk with each other. Later that afternoon Goldstein, Aragon, Furiani and Jimmy Parks met in the coffee shop of the Gunther hotel. Goldstein and Aragon supposedly got into a scuffle or fight and Aragon and Furiani then left. This was done to make publicity for the event of the 18th.

Goldstein further testified that on Monday afternoon he was in Aragon's hotel room and that Aragon explained to him how he was to get hit and throw the fight, and further, during that same talk, Aragon told him to get $500 and put it up for good faith because he, Aragon, did not trust him. Aragon was to get Jimmy Parks to advance $500 to Goldstein.

On Tuesday morning, December 18, before the weighing-in ceremonies, Goldstein went to Aragon's room and Aragon told Goldstein to go to Parks and get the money and turn it over to him, and he then would in turn give it to a friend for the purpose of betting on the outcome of the fight. At the weigh-in ceremony a doctor was present and gave Aragon a casual examination, and Aragon said, ''I'm in good shape.'' This was said by Aragon in spite of the fact that for several days

prior thereto he had been under the care and attention of his physicians and doctors in Los Angeles for an ailment and was taking medication prescribed by such doctors therefor.

Parks paid to Goldstein on account $500, and Goldstein with Mr. Busrelli, who was acting as Goldstein's trainer, went to the bank, and with the money secured traveller's checks and put them into the hotel safety box. Goldstein went to his hotel room and later received a call from Aragon telling him to get the money to him. Goldstein told Aragon that he had bet the money on the fight and could not get it. Aragon then told Goldstein to get the money back by 4 o'clock p. m., and Goldstein agreed that he would do so.

That afternoon Goldstein called the police of the city of San Antonio, and later a Sergeant Byler of that department contacted Goldstein. Goldstein and the policeman then went to the police department where there was a conversation about the matter. It was arranged that Goldstein would call Aragon on one of the police telephones and two officers would listen to what was said from extensions on the line. When Aragon answered the telephone he asked Goldstein for money, but in the entire conversation nothing was said about any fixing of the fight. The officers went to Goldstein's hotel and placed themselves across the hall from Goldstein's room. They made certain observations of people coming to and leaving Goldstein's room. Aragon was talked to on the telephone by Goldstein, and during this talk Aragon told Goldstein to get over to his place with the money, and if not, "I'll get sick and call the fight off."

Officer Byler drove Goldstein to the arena where the fight was to be held. Goldstein's dressing room was across the hall from Aragon's dressing room. Aragon arrived at the arena at the insistence of Parks, one of the promoters. A doctor engaged either by the promoters or a boxing commission representative, examined Aragon at that time and stated that Aragon was not in physical condition to fight, saying, "This man needs medical attention." The fight between Aragon and Goldstein was then called off and arrangements were made for Goldstein to fight one of the boxers who had been a sparring partner. A police officer, Aragon, and the doctor who had just examined him went to a nearby hospital where Aragon was examined by another doctor called in by the first doctor. The second doctor found Aragon to be ill and stated, in essence, that he was in no condition to fight. Aragon then

went to the place where he was then staying and went to bed, taking the medications which were perscribed for him by the doctors.

On the next day, M. B. Morgan, Commissioner of Boxing in Texas, called a hearing in the afternoon. Aragon got up from his sickbed to attend. At the hearing, after considerable testimony had been taken, the Commissioner said, "Would either or both of you be willing to take a lie detector test on this thing?" Each apparently indicated that he would be so willing, and the Commissioner told them that he would "suggest to the District Attorney that he arrange to take your testimony. . . ." Morgan, Goldstein and Aragon went to the San Antonio police department office where Goldstein and Aragon each took what purported to be a lie detector test. After the test was given there was a conversation between Morgan and Aragon. Morgan testified, with reference to such conversation, after objections thereto were overruled, as follows:

"Well, he (Aragon) wanted to know how the test went. I told him that it was a little bad, that it showed that he was not telling the truth all the way through, but instead it showed that he was lying concerning the answers to the questions that he gave at the hearing that very afternoon, and in other questions concerning the fight. Well, he said that, 'I admit that I didn't tell the whole truth. But,' he says, 'all the report, the story that Goldstein gave was not all the truth, but,' he says, 'I did have conversation with him about the fight.' That 'I probably overemphasized the fact about going down in the third or fourth round. But,' he says, 'I said, "Now, if you do go down in the third or fourth round, to stay down, don't get up and be cut up."' Then he asked me what I was going to do about it. I told him I couldn't give him any promises, I would have to wait to see what the evidence added up to be, as to what we would do. He wanted to know if he could—if I was going to suspend him. I says, 'Well, I'm quite certain that I'm going to suspend you in Texas.' He says, 'Well, will that suspend me in any other States?' I said, 'I suppose it will. I'm not sure about that.' Well, he pleaded with me not to suspend him, saying that he had a wife and three children, it would hurt him badly and that he would like for me to promise him that he could make some engagements in January, some fight engagements in January. I told him I wouldn't promise him anything; however, I did

assure him again that I was going to suspend him, again, in Texas, which we did do.''

Aragon stated that on several occasions prior to the 18th he had loaned various sums of money to Goldstein totaling several hundred dollars and that he, Aragon, was very desirous of being repaid his money and that the talks he had with Goldstein about money were with reference to the payment of what was due and owing to him for previous advances or loans. Some of the testimony of Aragon as to his money transactions with Goldstein was corroborated.

Aragon further testified that in talking with Morgan in Texas he had stated to Morgan that he had told him some untruths, but what he meant in that connection was that he was sorry about the ''phony publicity fight'' he had with Goldstein in the restaurant, that he was sorry about meeting with Goldstein in his room and that he was sorry about having puffed up Goldstein as a good opponent; further, that he at no time offered Goldstein a bribe for a fight or to induce Goldstein to do less than his best in the fight—that he did say to Goldstein that when he got knocked down to stay down and thereby not get hurt so badly, but that he has told that, in substance, to practically every opponent in his fights because he did not want to hurt them.

The appellant asserts as errors and grounds of appeal:

1. The court's rulings on the admission and rejection of evidence constituted prejudicial error.

2. The district attorney committed prejudicial misconduct.

3. Misconduct of the judge.

4. The verdict is contrary to the law (the trial court lacked jurisdiction).

5. The court erred in instructing the jury.

6. The evidence was insufficient to support the verdict.

The deputy district attorney, in his opening statement, said:

''Mr. Morgan, who is the boxing commissioner of Texas, is also here. He will testify that he had a conversation with Art Aragon at the police department, *both Goldstein and Aragon had taken a lie detector test*, Aragon said to Mr. Morgan, 'How did I do in the test?' '' (Emphasis added.) The following then occurred:

''MR. CARUSO: Your Honor, I'm going to object to any reference to a lie detector test at this time——

"Mr. Ritzi: If the Court please, it is part of the conversation. I think it is material.

"The Court: *The objection will be overruled.*

"Mr. Ritzi (continuing with his opening statement): *Morgan told Aragon he failed the lie detector test and that Goldstein had passed it.*

"Mr. Caruso: I am going to object to that as being totally irrelevant and immaterial; and further does not represent what was said to Mr. Morgan at the time, purely argumentative——

"The Court: Of course, relates to a conversation in that regard, it may be received. The jury is admonished that you are not to take into consideration that that is any evidence as to the efficacy of the lie detector test.

"Mr. Ritzi: Mr. Morgan told Mr. Aragon that he had lied. Mr. Aragon said, 'Yes, many of the questions that were given to me concerning this matter I have lied.' And he said, 'There were conversations between Dick Goldstein and myself.' He said, 'Perhaps I overemphasized about going down in the third round.' " (Emphasis added.)

█ The deputy district attorney knew, or should have known that evidence of a lie detector test is not admissible in evidence in this state. It is obvious that in his opening statement he was attempting to, and in our opinion, did deliberately implant in the minds of the jury that Goldstein and Aragon each had taken a lie detector test, that Goldstein had passed such a test and that Aragon had failed in such a test. This was not a subtle insinuation to get the prohibited matter before the jury by innuendo (which would have been bad enough), but to the contrary, it was an outright statement of what he expected to prove. At once the error was called to the attention of the trial court and instead of advising the jury properly on the matter, or on his own motion declaring the cause to be a mistrial and discharging the jury, the court stated, ". . . you are not to take into consideration that that is any evidence as to the efficacy of the lie detector test."

M. B. Morgan was the first witness called by the prosecution. After a very few preliminary questions he was asked by the deputy district attorney:

"Q. At the conclusion of that hearing did you, Mr. Goldstein, and Mr. Aragon go to the police department at San Antonio? A. Yes, we did.

"Q. All right: and *was a certain type of a test given to Mr. Goldstein and to Mr. Aragon?* A. *Both Mr. Aragon and*

*Mr. Goldstein took a lie detector test."* (Emphasis added.)

Defendant's counsel immediately made an objection to the introduction of any evidence concerning a lie detector test.

The deputy district attorney then continued: "If the Court please, this is wholly preliminary to a conversation that was had immediately after this concerning that test, and certain statements made by Mr. Aragon. I am asking this in good faith.

"THE COURT: The objection will be overruled.

· · · · · · · · · · · ·

"Q. BY MR RITZI: *After the test was administered to both Mr. Goldstein and Mr. Aragon,* was a conversation held between yourself and Mr. Aragon? A. Yes, there was." (Emphasis added.)

Defendant's counsel again renewed his objection, saying:

"I'm going to renew my objection, your Honor, no showing Mr. Morgan conducted the test involved, anything arising from these tests would be clearly inadmissible. If counsel wishes to bring out Mr. Morgan took the test, fine. So far we've got references to a test, nothing establishing who gave the test, but a conversation based upon the test, I don't think that's relevant, your Honor.

· · · · · · · · · · · ·

"Q. (by the deputy district attorney) Was a test, given, sir? A. (by Mr. Morgan) There was.

"Q. Who was the test administered by? A. Lt. Garza of the San Antonio Police Department.

"Q. Lt. Garza of the San Antonio Police Department, is that correct, sir? A. That is right.

"Q. And was all or part of that test conducted in your presence, sir? A. It all was conducted in my presence, I witnessed it from an adjoining room.

"Q. After the test was given, did Lt. Garza give you certain information?"

At this point defendant's counsel stated, "I'm going to object to that, calling for hearsay evidence," and Mr. Ritzi replied, "If the Court please, this was what he asked for," whereupon the court instructed the jury as follows: "Ladies and gentlemen of the jury, there will be introduced at this time testimony of a conversation which will in part relate to a lie detector test. You are admonished that you are to disregard any portion of the conversation which relates to the outcome of the lie detector test, or its efficacy as evidence."

The questions were continued with and the answer of Morgan has heretofore been set forth.

During the cross-examination of Aragon the deputy district attorney again turned to the subject of the lie detector test. Some of the questions and answers were:

"Q. At the conclusion of that hearing you went to the Police Department, isn't that true, isn't that true? A. Yes, sir—the police department, . . . .

"Q. All right. And Mr. Morgan was there, isn't that true? A. Yes, sir.

"Q. *And a lie detector test——*

"Mr. Caruso: I object at this time, your Honor, to any mention of a lie detector test as inadmissible in California.

"Mr. Ritzi: I'm going into the conversation he had with Mr. Morgan.

"Mr. Caruso: It wasn't necessary to inject the words 'lie detector test,' your Honor, I ask the Court to cite Mr. Ritzi for misconduct.

"The Court: The Court has already ruled on that. *As far as mentioning the test, that is one thing and the results is another thing.* Overrule the objection, at this time.

"Q. By Mr. Ritzi: *A test was administered,* isn't that true? A. *Yes, sir.*

"Q. And after the test you went over and had a conversation in the police department with Mr. Morgan, right? A. It was right there, sir, as I came out I was very groggy, I can't remember to this day.

"Q. As I understand it, you asked how did Goldstein do *and he said Goldstein passed the test?*

"Mr. Caruso: I am going to object to this entire line of questioning. It is obvious counsel is trying to get in evidence of a lie detector test which is not admissible in California or Texas or any place else, because it is not reliable; if counsel is attempting to convey to the jury he failed a lie detector test, this entire line of questioning is immaterial, your Honor.

"The Court: Do you want to be heard?

"Mr. Ritzi: Your Honor, I am trying to get in that conversation he made after the test and the reason he made the remarks.

"The Court: I think the conversation was gone into on direct examination, wasn't it?

"Mr. Caruso: No, sir, it was not.

"Mr. Ritzi: Yes, it was, your Honor.

"The Court: Not with this witness—gone into in the testi-

mony of Mr. Goldstein. *This man has never denied that conversation or any part of it.* Sustain the objection on the basis it is not proper cross-examination.

"MR. RITZI: That is the entire Morgan conversation, your Honor?

"THE COURT: Any reference to the lie detector test, it's out, or results." (Emphasis added.)

Again, in the opening and closing arguments to the jury the deputy district attorney hammered home the matter of the lie detector test and the results thereof. A careful examination of the record does not disclose that Morgan at any time told Aragon that "he had failed the test and that Goldstein had passed it."

Further, it must be kept in mind that Morgan did not make or conduct any test, and his information with reference to whatever the test results were came to him from a talk he had with a Lt. Garza, who supposedly conducted the so-called test.

In the case of *People* v. *Wochnick* (1951), 98 Cal.App.2d 124 [219 P.2d 70], the defendant was charged with murder, and in the trial a police officer was called to testify. Over the defendant's objection, the officer repeated the conversation between himself and the defendant, during which he explained in detail the operation of a lie detector. The officer testified that when he had asked the defendant if he could explain why, when during a lie detector examination he was shown the murder knife, there was a violent reaction on the graph of the machine indicating guilty knowledge, the defendant replied that he could not explain it. The defendant was convicted and the court denied a motion for a new trial. On appeal the cause was reversed, the court saying, among other things (at p. 128):

"We are in accord with the views expressed in the foregoing cases that 'the systolic blood pressure deception test for determining the truthfulness of testimony has not yet gained such standing and scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory.'" And at page 129, "Furthermore, the admission into evidence of this testimony placed before the jury the result of the lie detector test, which in itself was inadmissible for the reasons hereinabove stated, and constitutes prejudicial error." (See also *People* v. *Carter,* 48 Cal. 2d 737 [312 P.2d 665].)

In the instant case there is nothing before us to establish what kind of lie detector test was given, if any; there is nothing concerning the accuracy of such a test; there is no showing that the tests, even if properly given, have achieved sceintific recognition in this state; there is no foundation for the admission of any test results; and there is no stipulation that the testimony could be received in evidence. It is not at all unlikely that a popular belief has been formed from press, radio, television, stage and screen that the lie detector is an accomplishment of modern science the results of which are as reliable as those of fingerprinting, blood tests and ballistics. However, this is not correct. It is general knowledge among those familiar with the lie detector machines that the results are greatly dependent upon the training, experience and skill of the operators and that the results vary with different types of subjects.

In the present case the operator of whatever the machine was, if any, was not called upon to testify. We do not know what general methods he used in giving the tests, and we have no evidence as to his ability to make a test or to analyze the results thereof. For all we know, he may have been a charlatan or a blundering incompetent, or a fully qualified expert.

It may well be that the lie detector test is of use in the field of criminal investigations and for some other purposes, but we know of no appellate decision sustaining its use in the trial of a criminal case in the absence of a stipulation. Appellate court reports throughout the country would indicate an agreement that the best lie detector test to date is a thorough, painstaking and searching cross-examination by competent counsel.

If the result of the lie detector test is inadmissible in the first instance, surely no one would contend that the results can be cloaked in the raiment of an accusatory statement and then slipped into evidence. If we were to hold that such a course is proper we would have sanctioned the receipt of damaging evidence which, but for such masking, could not be heard by the jury. We believe that the prosecution should not be permitted to introduce into evidence by indirection what would be highly improper if done directly. Our system of jurisprudence is not constructed upon such a foundation. Moreover, it would be hard to believe that the jury here considered the statements solely as accusatory statements.

 Obviously the statements with reference to the lie

detector test as introduced in this case were highly prejudicial and in our opinion constituted prejudicial error. As said in *People* v. *Lyons,* 47 Cal.2d 311, 318 [303 P.2d 329] : " 'Upon the other hand, where the misconduct is of such a character that it cannot be purged of its harmful effect by an admonition, it will be considered as a possible ground for reversal in cases where the jury has been admonished (citing cases), as well as in cases where no objection was made or admonition requested on behalf of the accused (citing cases). In either situation, where the case is closely balanced and guilt has not been so clearly established as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed ground for reversal. (Citing cases.)' "

The deputy district attorney undoubtedly had talked over with Morgan the matter of what his testimony would be. It was said in *People* v. *Bentley,* 131 Cal.App.2d 687, 690 [281 P.2d 1] : "The district attorney knew, or should have known, the testimony the officer was going to give and should have warned him not to make the statement. Every prosecutor who offers a witness to testify to conversations with an accused should know what the witness will relate if given a free hand. The prosecutor has the duty to see that the·witness volunteers no statement that would be inadmissible and especially careful to guard against statements that would also be prejudicial. The court struck out the objectionable statement of the officer but the damage had been done and could not have been cured by the court's admonition. The mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors."

The respondent contends that there was no intention to violate the rules and that the questions were asked in good faith. It makes no particular difference what the deputy district attorney intended, but in any event it would take a naiveness which we do not possess to believe that the prosecution in the instant case had any purpose in mind other than to take an unfair advantage of the defendant.

Counsel for Aragon was also unduly limited in his cross-examination of Goldstein. The cross-examination of a witness by an opposing party has been described as, "the greatest legal engine ever invented for the discovery of truth." (Wigmore, Evidence, 3d ed., § 1367.) It is not a privilege which the court may grant or deny, but is an absolute right of the litigant against whom the testimony is offered.

One of the first questions asked of Goldstein was, "Sir, what is your real name?" An objection was made by the prosecution, and counsel for the defendant attempted to point out that the matter went to his credibility and that it was preliminary, and the court then announced, "You heard the rule on the question, did you?" Counsel then asked Goldstein, "Under what name did you apply for your license?" and an objection thereto was sustained. In another instance counsel inquired of Goldstein as to the first time an amount of $500 was mentioned and Goldstein testified as to when such took place; upon further questioning it developed that he had told the Texas Boxing Commission a different story as to the same matter. Counsel in his effort to get straightforward answers from Goldstein about the matter was cut short by the judge. Finally, the court stated, "Nothing inconsistent about any $500 in that statement. The record is obvious." It was then brought out that Goldstein had caused to be prepared a brochure concerning himself, wherein he was depicted as a business executive, as a welterweight contender and as a decorated battle veteran of the Korean war. Counsel was stopped from showing, by Goldstein, that the contents of the brochure were false.

In the examination of Goldstein and other witnesses it was developed that Goldstein had referred to Mrs. Lierman as his fiancée, and that the relationship between the two was more than that of a passing acquaintanceship. Aragon testified that Goldstein had told him they lived together. On cross-examination of Mrs. Lierman she was asked if she had any financial interests with Goldstein. She stated that the automobile was in both of their names, and when asked, "How about furniture?" the judge said, "Just a moment. I will sustain the objection." Counsel for Aragon then stated that he would like to make an offer of proof, and the judge said, "Objection still sustained." This is in spite of the fact that the deputy district attorney had not objected to the question.

Further, counsel was stopped from pursuing his cross- examination of Goldstein as to certain head injuries which Goldstein was supposed to have received. It was the contention of the defendant that he had a right to show the mental condition of the witness Goldstein, and that he had a right to do so by cross-examining him. (See *People* v. *Bell*, 138 Cal. App.2d 7 [291 P.2d 150].)

The judge took occasion more than once to make statements to Aragon's counsel which verged on ridicule and which strongly indicated his leaning in favor of the prosecution. A few examples follow. While counsel was examining the witness Goldstein, an objection was made to the form of a question, and the court said, "The objection will be sustained. I related to you before the proper time to bring that out is in argument. There is no necessity of playing the record over and over again here in this courtroom, the time and place for that is in the record, you can argue it from the record when it comes time to argue it." Again when counsel was attempting to impeach Goldstein by showing that he was consuming intoxicating liquor, even though he was supposedly in training, the prosecution objected saying, "Just a moment, counsel, are you going to try to impeach him for having a cocktail, now, or something of that sort? There is going to be an objection, your Honor." The court then stated: "It is going to be sustained, too." At this point counsel for appellant indicated he would like to make an offer of proof, to which the court made the following reply: "You don't have to make an offer of proof every time you turn around. Objection sustained. That's it." And shortly thereafter the court said in answer to a statement by counsel for defendant: "Just a minute. Impeachment on an immaterial doesn't mean anything. That is what you are doing all day long here it seems to me." Then, when asking about the Texas Boxing Commission proceedings, counsel said, "I have one more reference to the Texas Commission hearing, your Honor, and ladies and gentlemen of the jury." The court said, "Let's keep at one thing at a time. You get everything mixed up. Now, stay with your transcript, at least until this question is completed and then go on."

It has been correctly stated that it must be borne in mind that juries are susceptible to the comments of the judges and are constantly impressed with any indication of the leanings or opinion of the court in favor or against either side—any issue—or any witness. ■ Also, conduct and comments on the evidence by the judge to the jury in a criminal case must be fair, temperate, judicial, dispassionate, and free from apparent contentiousness, partisanship, or advocacy. It has been frequently held that such comments should not be argumentative. It was set forth in *People* v. *Zammora,* 66 Cal.App. 2d 166, at pages 210-211 [152 P.2d 180] :

". . . jurors watch courts closely, and place great reliance

on what a trial judge says and does. They are quick to perceive a leaning of the court. Every remark dropped by the judge, every act done by him during the progress of the trial is the subject of comment and conclusion by the jurors, and invariably they will arrive at a conclusion based thereon as to what the court thinks about the case. . . . However, impatient a trial judge may be with a defense, he should be careful not to indicate such impatience by remarks or comments made during the course of a trial which will prejudice a defendant.''

In *Quercia* v. *United States,* 289 U.S. 466 [53 S.Ct. 698, 77 L.Ed. 1321], the court said (at p. 469) :

''In a trial by jury . . ., the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.'' And continuing at page 470: ''The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' '' And, ''It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf.''

We have carefully examined the contention of the appellant to the effect that the trial court lacked jurisdiction to hear the case, and we have concluded that there is no merit therein.

 Under the instructions which were given, the jury could have disbelieved that Aragon made an illegal offer in California, but have believed that an offer was made in Texas, and still found him guilty of the offense in California. Such is not the law.

In our opinion, the defendant did not have a fair trial as that term is understood under our system of law.

''It is axiomatic that when an accused is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law (*Powell* v. *Alabama* [1932], 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]). Criminal cases should not be conducted with an eye to the saving grace of section 4½, article VI of our state Constitution. Excepting motions for a new trial, the constitutional section is of no concern to the trial courts, and so far as its application goes, it is of interest only to the courts of review (*People* v. *Black* [1925], 73 Cal.App. 13, 43 [238 P. 374]).'' (*People* v. *Lyons, supra,* p. 319.)

The errors were prejudicial and a reversal is required for the reasons herein set forth. There has been a miscarriage of justice.

The order denying a new trial is reversed. The attempted appeal from the ''order denying probation'' is dismissed.

White, P. J., and Drapeau, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.