Commonwealth *v.* Hipple, Appellant.

Argued November 29, 1938.  Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Chas. E. Mills,* of *Mills & O'Connor,* with him *Robert W. Trembath,* for appellant.

*Wm. G. Schrier,* with him *Albert F. Heess,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, January 9, 1939:

The defendant, Ernest M. Hipple, was indicted for the murder of Jennie D. Porter. He pleaded guilty. After a full hearing and due consideration of all the evidence the learned court below adjudged him guilty of murder in the first degree and fixed the penalty at death. Defendant appealed from the judgment and sentence imposed.

The chief error assigned is that the court committed an abuse of discretion in sentencing the defendant to death, the contention being that the punishment should not exceed that of life imprisonment. There are two other reasons assigned as error, to wit: a ruling of the court that a confession made by defendant on February 16, 1938, induced by the use of a so-called lie detector, was voluntary, and in admitting it in evidence; and in admitting evidence concerning the prior forging by defendant of the name of Jennie Porter on a check belonging to her.

Although the finding of first degree murder is not challenged, it is incumbent upon us to review the record to determine whether the essential elements of first degree murder are present. In doing so we accept as true all the evidence adverse to defendant, since the credibility of the witnesses was for the court below: *Commonwealth v. Shawell,* 325 Pa. 497. We have made such examination and find all the necessary ingredients of murder of the first degree present in the case.

To determine whether the appropriate penalty was imposed, we must consider the history of the past life of the defendant, as well as the facts of the crime. At the time of the murder, February 7, 1938, the defendant was

twenty-one years of age; he left school when he reached the seventh or eighth grade to go to work; he worked very irregularly, sometimes caused doubtless by the fact that he could not get work to do; he was much given to hunting, which made him familiar with firearms; he had contracted a forced marriage and was the father of a child; he had the usual intelligence of one of his years who was born and reared in a mountainous and isolated community. In general, his life was that of a woodsman and mountaineer, and his meager livelihood was made principally by hunting and trapping, by fishing, and by hiring out to farmers for work in the fields.

In the same neighborhood in which defendant had spent his life lived Jennie D. Porter, the wife of John Porter, a woman of about seventy years of age. She and her husband had known defendant since his birth. He was a frequent visitor at their house and for a short time prior to the commission of this crime he had been a daily caller. He had learned that Mrs. Porter kept money in the house, this fact being common knowledge in the neighborhood. After her death $110 was found in her pocketbook hidden in the house. The defendant decided it was necessary to destroy her in order to get her money and, according to his own confession, he deliberately planned her murder four days in advance of the cruel act. He said: "I went down to Porters and went in and she was eating. The door was locked and she opened it up and left me in and said, 'Oh, it's you.' She sat down and started to eat again. I sat down on the chair in front of the feed bags. I sat there a few minutes. Everything seemed to blur a few minutes and then I shot her. She fell off the chair sideways toward the right. Then I set my gun down by the door that goes out towards the back. Then I drug her in the bedroom by the feet. Then I got scared and left. Q. When did you first decide to shoot Jennie Porter so you could get some of the money that you always thought she kept around the house? A. I had in mind for some time to

try to get some money off Jennie in some way and when I asked my cousin Roy Guisewhite if he had any .22 cal. ammunition I had then made up my mind that the only way I could get the money would be to shoot her."

The day following the commission of the crime the defendant was taken into custody by the State Police, and nine days thereafter, during which time he was frequently questioned about the crime with apparently no results, he made a full confession. Several hours prior to this happening a lie detector was applied to the defendant by the officers. Its operation was explained to him, and he was told that he could lie to the officers but he could not lie to the machine. The defendant inspected it, asked to have it applied again so that he might see it work, which was done, and it was then he broke down and stated that he committed the crime. He was immediately returned to the jail from the place where he was examined, and two hours later the officers went to him and asked him if he desired to correct his previous statements and to tell the whole truth, to which he replied that he did, whereupon he made a full confession in which he acknowledged his guilt.

The principal assignment of error stated that the court below abused its discretionary power in inflicting the extreme penalty. The defense insists that he should have the benefit of the lesser punishment, namely, life imprisonment, for the reason that he does not have the mentality of the average person but only that of a moron. It is admitted that his mentality is such that he was capable of understanding the difference between right and wrong. This was conceded by the defense, both in the opening address and in the testimony of Doctor Fish, its chief witness. The latter concluded that the defendant fulfilled "the definition of what Webster's Dictionary regards as a moron." He added: "A moron is an individual whose brain advances only to the age of eight years. He never exceeds the mentality of a child of twelve years." Dr. Fish, and the mother, sister and

wife of the defendant were the only witnesses called by the defense to throw light upon his mental capacity. Dr. Fish saw the defendant for the first time the day on which he took the stand and he spent only one hour in obtaining the history of his life and making his examination. He admitted under cross-examination that he talked only to the defendant and his mother, that he did not speak with his school teachers or neighbors, and that he was unfamiliar as to how the defendant conducted himself towards those people.

The Commonwealth called four school teachers who had taught the defendant. Mr. L. W. Williams, one of the school teachers, knew the defendant all his life. He testified that he had not discovered anything to indicate that the defendant was feeble-minded or mentally defective, or a problem child. This testimony was substantiated by E. R. Fanning, George Heims and Jesse Williams, the other school teachers; the last named witness testifying as follows: "Q. From your observation of his manner and his conduct and his appearance, taking into consideration the fact that he was a pupil of yours, did you or did you not discover anything in him that led you to believe that he was feeble-minded or mentally defective? A. I did not. Q. As a school teacher, did you consider him a problem child? A. I did not." The Commonwealth also called C. M. Williams, Lynn Kilmer, Charles Shadduck, Earl Ayers, and Amy Kaseman, all of whom had practically a life-long acquaintance with the defendant and who testified that there was nothing to indicate that the defendant was mentally defective. Mrs. Nina Fiester and Mr. Lawrence Baumunk testified that they were store keepers, that the defendant traded in their stores, and from their observation of him there was nothing to indicate that he was mentally defective. Gleason Porter testified that the defendant lived at his home for at least a year and a half; that he did not discover anything which would lead him to believe the defendant was feeble-minded or mentally defective. The

learned Judge of the court below said in his opinion: ". . . . For about three days we observed the defendant during the hearing rather carefully. . . . He presents no appearance of a dullard but on the contrary seems bright and alert. If he had been queer or mentally deficient, his neighbors, associates and teachers, would have been the first to discover it."

There is not room for the slightest doubt concerning the mental competency of the defendant. It was not until after he had committed this dreadful crime that any one thought to question his mentality. His habits of thought and action had always been those of a normal person among the people with whom he spent his life. He knew perfectly well what he was doing at the time of the crime, the details of which he had carefully arranged, and he understood the nature and consequences of his act: *Commonwealth v. Hawk,* 328 Pa. 417. He deliberately committed murder with the intent to perpetrate a robbery. It was not an abuse of discretion to impose the death penalty. It was the uniform penalty imposed by the law itself in all first degree murder cases prior to the Act of May 14, 1925, P. L. 759, which vested in the court, when sufficient mitigating circumstances are present, the power to impose a sentence of imprisonment for life.

The confession of defendant of February 16, 1938, was properly admitted in evidence. There was no promise, force or threats used in obtaining it: *Commonwealth v. James,* 294 Pa. 156. The objection seems to be to the use of the lie detector. The defendant was told when this device was placed upon his arm that he could lie to the officers but that he could not lie to the machine. It would seem the sole question raised by this issue is whether a confession obtained by a trick can be used, and this question has been repeatedly answered in the affirmative by the authorities. Since the exclusion of confessions is not due to any principle of public faith or of private pledge of secrecy, it follows that the use of a *trick* or

*fraud* (however reprehensible in itself) does not of itself exclude a confession induced by means of it. So far as the trick involved a promise which would tend to produce an untrue confession, it would operate to exclude, —not, however, because it was a trick (i. e., because the representations were false) but because even if true its tenor would have stimulated a confession irrespective of guilt. This principle is and always has been universally conceded": 1 Wigmore on Evidence, page 957, sec. 841; *Com. v. Spardute,* 278 Pa. 37; *Com. v. Goodwin,* 186 Pa. 218.

The statement by the officers, "You can lie to us but you cannot lie to this machine," in substance amounts to no more than the familiar phrase, "It would be better for you to tell the truth," which this court has often sanctioned: *Com. v. Weiss,* 284 Pa. 105; *Com. v. Spardute,* supra. Here no inducement of material reward nor fear of punishment, conducive to eliciting an untrue statement, was employed. A confession, procured by a trick or artifice, not calculated to produce an untruth, is never vitiated thereby: *Com. v. Goodwin,* supra; *Com. v. Spardute,* supra. It may be that it was the use of the lie detector which produced the confession. This would seem certain if it were not for the fact that it was not until two hours after the use of the device, during which time defendant had time for reflection and composure, that he confessed. It is quite possible that he was persuaded to do so by the use of the machine and what the officers told him concerning it. The record of the lie detector was not offered in evidence. Since the use of the device was for the purpose of inducing the defendant to tell the truth and not anything was done to influence him to do otherwise, an objection based solely on the fact that he was thus induced to confess cannot be sustained.

The court below did not err in admitting the evidence concerning the forgery of the name of Jennie Porter by the defendant on a certain check offered in evidence. As

we said in *Commonwealth v. Gable*, 323 Pa. 449, 452: ". . . if a voluntary confession is made to police officers, the whole is admissible in evidence, even though it may contain admissions of other offenses unrelated to the one for the commission of which the defendant is on trial: *Com. v. Weston*, 297 Pa. 382; *Com. v. Dague*, 302 Pa. 13." This assignment is trivial. No possible prejudice could result to defendant in such a serious case by such a minor matter.

In reality, there is but a single question in this case,—whether the learned court below exercised a sound discretion in imposing the death penalty. Our answer is, in the language of that court, "We have sought in vain to find one thing in this case justifying mitigation."

Judgment and sentence affirmed, and record remitted for the purpose of execution.