(No. 29475.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SHIRLEY ROBERTA SIMS, Plaintiff in Error.

*Opinion filed Sept. 18, 1946—Rehearing denied November 14, 1946.*

EUGENE WOOD, JOSEPH E. CLAYTON, JR., ZEDRICK T. BRADEN, WILLIAM A. BOOKER, and HOUSTON H. HALL, all of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and WILLIAM J. TUOHY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, RICHARD B. AUSTIN, and C. D. PEMBERTON, all of Chicago, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error, after a trial in the criminal court of Cook county, upon an indictment for murder, before the court, a jury having been waived, was found guilty of manslaughter and sentenced to the Illinois Women's Reformatory at Dwight for a term of years not less than two nor more than four years. She brings this writ of error to review the record, urging, as her main assignment of error, the admissibility in evidence of two statements, designated in the record as exhibits 1 and 4.

Edward J. Porter, a Pullman car porter, about 55 years of age, lived in a room at 6118 South Parkway in the city of Chicago. On the morning of July 10, 1945, about 8 A.M., his landlady, upon her return from work, found her front door open, and upon entering her apartment found Porter sitting in a slouched position on the couch in the living room. His body, head and shirt were bloody; his trousers were pulled down around his knees; his pockets turned inside out. On the floor was a broken champagne bottle and a broken mineral oil bottle. In Porter's room was an electric iron. His trunk, which he always kept locked, was open, and the contents "tumbled up." She called the police. Plaintiff in error, a girl of 17 years, was arrested at the home of her stepfather, taken into custody and retained without being booked, from Tuesday until Saturday. At the time of the arrest plaintiff in error was wearing Porter's wrist watch, which she said he had given to her to wear.

It is undisputed that plaintiff in error and Porter were together in the apartment where he roomed; that they, early in the evening of July 9, 1945, went to the Archway Lounge, where plaintiff in error drank three or four cremes de menthe and milk. About 11 P.M. they went to the apartment where Porter roomed. Plaintiff in error drank a quart bottle of champagne and two drinks of whiskey. Porter drank whiskey. Porter gave plaintiff in error $10 with which to purchase another bottle of champagne and cigarettes. She purchased the champagne and cigarettes and returned to the apartment.

The People's evidence was that of Eleanor Carruthers, the deceased's landlady, who testified she came home on the morning of July 10, 1945; that she found her front door open; found Porter dead; called the police and described the condition of his body, the rooms and what she saw; that Porter's trunk was open, the contents ruffled up, his money and wrist watch were gone and the electric iron

was on the floor near the trunk. Dr. Snider, a coroner's physician, testified to his examination of the body of Porter; that he found multiple lacerations about the front part of the left side of his head; two deep contusions and jagged lacerations over the base of the skull posteriorly; that both tables of the skull were depressed; that there were skull fractures and some hemorrhage beneath the skull fractures, and that in his opinion death was the result of a skull fracture and laceration of the brain.

The balance of the People's evidence was that of police officers, secretary to the Chicago Police Scientific Crime Detection Laboratory, and a court reporter employed in the State's Attorney's office, as to what plaintiff in error said at the Crime Detection Laboratory, when she was questioned with lie-detector apparatus attached to her. The testimony is that while the lie detector was still attached to plaintiff in error, but was not operating, a statement, known in the record as "Statement No. 1," was taken. This statement was introduced in evidence, though the questions asked and the answers given when the lie detector was operating were not introduced in evidence. There is nothing in the evidence to indicate that plaintiff in error knew that the lie detector was not in operation when the so-called statement No. 1 was taken or that she was not influenced by the fact that the apparatus was still attached to her body. Evidence of State's witnesses showed that she objected to the use of the lie detector. She was without the advice of counsel and it seems probable that a girl of her age supposed, as she said, that because of the use of the lie detector and the fact that it was attached to her she was required to make a statement. We are of the opinion that what was done amounted, under the circumstances of this case, to a use of the lie detector against her wishes. No court, so far as we are advised, has ever held that a lie detector may be used on the accused without his consent. The fact that State's witnesses testified

that the so-called statement No. 1 was substantially the same as other statements made to the police does not alter the rule to be applied. On cross-examination several of the People's witnesses admitted that plaintiff in error objected to being questioned and to a lie-detection test without first talking to her attorney; that she was not permitted to see a lawyer and that the tests and questions were taken without her consent. "Statement No. 1," not signed by plaintiff in error, and another exhibit No. 4, were objected to and a hearing was had on the question of their admissibility. Plaintiff in error testified on the hearing on the admissibility of the exhibits that she told the assistant State's Attorney, in the presence of the police officers, that she did not want to make a statement; that she did not want to submit to a lie-detector test; that she was induced to do so upon promises that her statements would not be used against her. Some of the police officers, including policewoman Clarke, testified that plaintiff in error objected to taking the lie-detection test and to making a statement without first talking with her lawyer. They each denied her testimony that she was assured her statements would not be used against her; but the assistant State's Attorney did not deny that she said she did not want to submit to examination by a lie-detector test. Officer Connally admitted plaintiff in error did not want to submit to an examination and lie-detection test but he decided he would take her there anyway, which he did, and on her arrival at the laboratory she again said she did not want to take the test. He admitted on cross-examination that she also said the same thing to officer Reed. The court admitted the exhibits.

As we are of the opinion that the lie detector was used illegally, and because of the probability that its application influenced, if it did not induce, the "first statement," and in view of the further facts that deceased was not found for some hours after plaintiff in error had gone to her

home, during which time his room was open, and when found his clothing had been ransacked, his trunk opened, and his money, said by his landlady to have been a considerable sum, was missing, though but a small amount of money was found on plaintiff in error, we believe that a new trial should be had.

The judgment of the criminal court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*