[Crim. No. 6063.   Second Dist., Div. Three.   May 12, 1958.]

THE PEOPLE, Respondent, v. WALLACE LeROY SCHIERS, Appellant.

366

Wallace LeRoy Schiers, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Lynn Henry Johnson and William E. James, Deputy Attorneys General, for Respondent.

SHINN, P. J.—In a jury trial, Wallace LeRoy Schiers was convicted of the second degree murder of his wife, Lillian R. Schiers. He appeals from the judgment and the denial of his motion for new trial.

The conviction was based upon evidence of the following facts: Mr. and Mrs. Schiers were married in 1952. They resided in a single-story two bedroom house in Granada Hills. Defendant, a major in the air force reserve, was employed as an electronic assembly supervisor at the Bendix aviation plant

in San Fernando Valley. His wife was a member of the Granada Hills Women's Club and took a prominent part in club activities.

On the morning of February 12, 1957, Mrs. Schiers had an appointment to meet a Mrs. Butcher and a Mrs. Peterson at the women's club. Alarmed by her failure to keep the appointment, the two ladies went to the Schiers' residence at 10914 Gaynor Street. They rang the bell and knocked on the door, but no one answered. Mrs. Peterson went to the rear of the house and entered through the back door, which was unlocked. Upon opening the door to Mrs. Schiers' bedroom, Mrs. Peterson discovered her nude body lying on the floor beside the closet. Mrs. Schiers had been brutally beaten; there were 13 horrible wounds and lacerations on her face and head. The cause of death was subsequently established as multiple fractures of the skull with intracranial hemorrhage and cerebral contusions. The murder weapon was never found, although Mrs. Schiers' mother testified that two small star-shaped glass candlestick holders and a heavy ornamental champagne bottle were missing from the house about a week after her daughter's death.

An investigation by Los Angeles police officers called by Mrs. Butcher disclosed no signs of a struggle anywhere in the house. None of the outside doors or windows had been forced, although, as we have said, the rear door was unlocked. The only fingerprints in Mrs. Schiers' bedroom were those of the deceased and there were no fingerprints elsewhere in the house that could not be identified. Mrs. Schiers' purse, containing a check and some cash, was in the kitchen; her gold wristwatch was lying on the dresser in her bedroom.

Leland V. Jones, a police lieutenant assigned to the Scientific Investigation Division, arrived at the scene at 1:30 p.m. He observed that the bed and the walls in Mrs. Schiers' room were covered with blood and there were bloodstains on the ceiling. On the floor beside the bed were a man's undershirt and a pair of men's shorts; the former was spattered with blood. Officer Jones qualified as an expert witness on the subject of forensic chemistry. He stated his opinion, based upon the pattern of the stains on the undershirt, that the garment had been lying in the same position when the blood spurted around the room.

The officers went to Mr. Schiers' bathroom and made a benzidine test, which is a standard test for blood. He gave the following description of the test: If a benzidine base, called a

latent color, is mixed with an oxidase, the oxidase will carry oxygen to the latent color and the solution will turn blue. Blood is an exceptionally good oxidase and will react to benzidine even when the solution is diluted to the extent of one part blood to three hundred thousand parts water; the higher the proportion of blood, the more immediate and vivid will be the blue color reaction. Officer Jones tested the wash basin and obtained an immediate and vivid blue reaction from all parts of the bowl; he tested the water in the commode and got a similar reaction. There was also a spot of diluted blood just above the faucets of the wash basin. There was no blood in the shower stall.

Meanwhile, defendant arrived home from work, having been informed by telephone of his wife's death. One of the officers present suggested that he submit to a benzidine test in order to eliminate him as a suspect; defendant consented to the test. Officer Jones asked Schiers to step into his wife's bathroom and remove his shirt, which defendant did. The officer then dipped some cotton swabs fastened to short sticks into the benzidine reagent and began to apply the solution to defendant's hands; his hands turned blue immediately. Jones testified that defendant's fingers "were all saturated with blood." Color transparencies, showing the marks on his hands, were received in evidence. There was no blood under the fingernails, for they were cut short. (In this connection, Fred Hartley, a brother-in-law of the deceased, testified that defendant usually wore his nails quite long so that they covered the fingertips.) Jones then applied more swabs to defendant's arms and chest; at each application of the solution, the affected area turned blue immediately. Defendant said: "My God, this puts me in an awful position." At the officer's request, Schiers removed his trousers and the solution was applied to his legs; the officer obtained a uniformly distributed blue reaction all over the front of defendant's body down to his knees. There was no indication of blood below the knees, on the feet, or on defendant's back. Jones did not test Mr. Schiers' face. The witness made a blood test in Mrs. Schiers' bathroom and in other parts of the house, but found no traces of blood.

On cross-examination, Officer Jones testified that bleaches, lead salts, nitrates and certain vegetable substances would also react positively to the benzidine test. However, it was his opinion that these substances would have to be applied sys-

tematically, rather than accidentally, to the body in order to produce a uniformly distributed color reaction.

Ray Pinker, chief forensic chemist with the Los Angeles Police Department, also qualified as an expert witness. Officer Pinker testified that he went to the Schiers' residence on February 14th and 15th and repeated the benzidine tests of the premises made by Lieutenant Jones. He used a solution containing hydrogen peroxide, so as to eliminate the possibility of ''false'' color reactions arising from bleaches. Pinker found no traces of blood in Mrs. Schiers' bathroom but in defendant's bathroom he got the same reactions that had been obtained by Officer Jones. The witness tested the soaps and detergents used in the Schiers' household and found none which could produce a color reaction. He also tested the dirty clothes in the kitchen washtub, but he found no traces of blood on the clothing.

There was conflicting evidence as to the time of death. Mrs. Schiers' liver temperature was taken by a deputy county coroner at 2:10 p. m. on February 12th; the temperature was 84 degrees. Dr. Frederick Newbarr, the coroner's chief autopsy surgeon, testified that the normal temperature of the human liver is 99.6 degrees. He gave his opinion, based upon his reading of the medical literature and upon studies he had conducted personally, that the temperature of the liver decreases, under ordinary conditions, on an average of between 1.3 and 2.0 degrees per hour after death; the rate of cooling will vary according to the room temperature. It was his opinion that Mrs. Schiers died at some time between 10:30 p. m. on February 11th and 6:15 the following morning; he fixed the approximate time of her death at 2 a. m. Kenneth Johnson, an expert witness called by the defense, gave his opinion that the time of death was 7 a. m.

Officer Louis Belle was one of the investigating officers in the case. He had a conversation with Schiers at the police station on February 13th while defendant was in custody. In response to the officer's questions, defendant said that he spent the evening of February 11th at home with his wife. They ordinarily slept in separate bedrooms, but they retired to her bedroom that night around 1 a. m. He returned to his own bedroom an hour later, read a little and went to sleep. He heard nothing unusual during the night; had anything unusual occurred, he would have heard it because he was a light sleeper. Defendant said that he arose at 5 or 6, showered and shaved in his bathroom and left for work around 6:30 a. m.

Upon being questioned about the benzidine test he stated that he had not cut himself and that he could not understand why the test indicated the presence of blood on his body. We will refer to other statements made by defendant in this and in subsequent conversations with Officer Belle at a later point in our opinion.

Defendant, testifying in his own behalf, denied killing his wife. He spent the evening at home with Mrs. Schiers. After dinner, he played solitaire and worked on income tax while Mrs. Schiers watched television. They drank a great deal. During the evening, Mrs. Schiers consumed six cans of beer and some scotch; defendant also drank some scotch. Around 10 p. m. they had "a little tiff" about politics. Shortly thereafter, Mr. Schiers went to the store and bought a pint of scotch and some bottles of soda, which they also consumed. They retired to Mrs. Schiers' bedroom at 1 a. m. and had sexual intercourse; defendant left his undergarments on the floor. . He went to his own bedroom an hour or so later. He did not see his wife or hear her voice thereafter, as she usually kept her door closed after retiring for the night. He heard no noise during the night. He awoke at 5 a. m., took a shower, shaved and left for work about 5:30. The candlestick holders were missing from his wife's bedroom several months before her death; he threw away the champagne bottle while cleaning out the kitchen a week or so after the murder. Defendant stated that the officer, in making the benzidine test, had only "made crossmarks up and down my arms and made, I think, three or four marks on the right and left sides of my chest." However, he could not account for his positive reaction to the test. He did not recall having come in contact with any of the other substances mentioned by the People's experts.

On cross-examination, defendant admitted that he and Mrs. Schiers had separated briefly in 1955 on account of his excessive drinking and gambling; she thought that gambling evidenced moral degeneration. He obtained a $2,450 loan from the bank in December 1956 in order to finance the construction of a rumpus room and patio. However, none of the loan proceeds were spent for that purpose. Defendant gave $690 to Mrs. Schiers, sent some of the money to his former wife, lost $900 gambling at the race track and spent much of the remainder at Christmas and in subsequent parties. He told Mrs. Schiers about $400 of his gambling losses but could not

recall telling her about sending the money to his former wife, although he felt that she knew of it.

Mrs. Ramona Allen, who lived in the house to the rear of the Schiers' residence, testified on behalf of defendant that she was awakened in the early morning of February 12th by an unusual noise in her backyard. The following day she discovered that her rear gate had been knocked down. One of the investigating officers called her attention to some footprints near the back of her house. Officer John J. Marrell, called by the People in rebuttal, testified that he examined the footprints with Mrs. Allen and pointed out to her that they were not fresh footprints. Officer Marrell and Officer Belle also testified in rebuttal that they had examined the area surrounding the Schiers residence and found no indication that a prowler had been in the neighborhood on the night of February 11th.

Four of defendant's fellow employes at the aircraft plant testified that his demeanor on the morning of February 12th was calm and that he performed his duties in the usual manner. Six persons, one of whom was defendant's former wife, testified that they knew of Schiers' reputation for peace and quiet and that his reputation was good. It was stipulated that there were 22 other character witnesses in court and that, if called to the stand, their testimony would be in agreement with that already given.

Defendant has filed several briefs in support of his appeal. The briefs are adequate as a statement of all the points that could be urged in his behalf. We have made a thorough examination of the record and have discovered no insufficiency of the evidence and no error at the trial which could have affected the result.

Defendant argues the following points in his briefs: (1) Reference was made to a lie detector test by one of the People's witnesses; (2) the court allowed inflammatory photographs to be exhibited to the jury; (3) the People were permitted to introduce a part of their case in chief in rebuttal; (4) the court committed misconduct; (5) the evidence was insufficient to support the verdict; (6) defense counsel was ill throughout most of the trial proceedings and was unable to defend him properly; (7) the court erred in giving an instruction as to accusatory statements.

The first point to be considered is that the results of a polygraph test administered to defendant were improperly before the jury. The incident occurred during the direct

examination of Officer Belle. The prosecutor was inquiring as to the conversation the witness had with defendant at the police station on February 13th. The deputy asked: ''Did you at any time ask him [Schiers] about the benzidine showing up blood on his skin?'' Belle replied that he did, and after relating that part of the conversation we mentioned earlier, the witness proceeded to relate a conversation he had with Schiers about a lie detector test taken by defendant voluntarily at the Police Administration Building on the night of February 12th. Schiers had denied his guilt to the officers. Belle told him that the test indicated he was lying. Upon being asked to reconcile his denials with the results of the test, defendant said that ''there was something wrong with the machine'' and that ''he couldn't understand it, even though he believed it [the machine] was accurate when they showed him the experiment.'' This testimony was received without objection.

Following the noon recess, which immediately ensued, defendant's counsel informed the court that he had ''no recollection of the last fifteen minutes of the proceedings this morning'' and stated that had he been aware of the officer's testimony he would have entered an objection. The court granted defendant's motion to strike the testimony and admonished the jury to disregard it in the following terms: ''Ladies and gentlemen of the jury, just before the noon recess, Mr. Belle was testifying. There was some testimony regarding the conversation had between Mr. Belle and the defendant in this case in which a polygraph or so-called lie detector was a part of the conversation. The Court has granted a motion of the defendant to strike all of that testimony. Now, you are not to consider or even recall that part of Mr. Belle's testimony where he made any mention of . . . that part of any conversation . . . wherein anything regarding a lie detector was even hinted at. You are to pass it all out of your mind . . . and as far as you and I are concerned, no mention thereof has been made . . . it is no part of the record and is not to enter into your consideration or even be mentioned by any of you from this moment on.''

Officer Belle's testimony was clearly inadmissible and the motion to strike was properly granted. Had the court denied the motion, it would have committed grievous error. (*People* v. *Wochnick*, 98 Cal.App.2d 124 [219 P.2d 70]; *People* v. *Aragon*, 154 Cal.App.2d 646 [316 P.2d 370].)

The court should have halted the testimony of the officer

at the first mention of the lie detector test, even in the absence of an objection. The defendant should not have been required to make an objection. It cannot be said that it was a situation in which the prosecutor should have anticipated the voluntary statement concerning the use of the lie detector. Nevertheless, although his question did not call for testimony concerning a discussion of the lie detector test it was his duty to interrupt the voluntary and improper statements of his witness.

We have no doubt that had prompt objection been made during the course of the officer's recital, the objection would have been sustained and the jury instructed to disregard the improper statements. Defendant argues, however, that the testimony was so prejudicial that its effect was not removed by the subsequent ruling. We cannot agree. In addition to granting the motion to strike, the court gave the strong admonition which we have quoted above. It is to be presumed that the jurors gave heed to the admonition and, in our opinion, the instruction was sufficient to dissipate the harm that had been done.

As to the second point, defendant argues that the court should have excluded from the evidence four gruesome photographs purporting to show the body of the deceased, the bloodstained bed in Mrs. Schiers' room, and the terrible wounds inflicted on her face and head. The argument cannot be maintained. While repugnant photographs of the scene of a crime may not be introduced in evidence where their sole purpose is to inflame the jury against an accused, such pictures are admissible if they have some evidentiary value; the matter lies within the sound discretion of the trial court. (*People* v. *Guldbrandsen*, 35 Cal.2d 514, 521-522 [218 P.2d 977], and cases cited.) In overruling defendant's objections to the admission of the photographs in evidence, the court ruled that they might be of assistance to the jury in determining the nature of the assault upon Mrs. Schiers and the weapon used to commit the crime. There was a logical connection between the nature of the wounds and the blood stains found on defendant's body. We cannot say that the court abused its discretion in allowing the exhibits in evidence.

With respect to the third point, defendant argues that the People were permitted to introduce on rebuttal a portion of their case in chief. The argument is without merit. As we have said, Mrs. Allen was called by the defense and stated that she heard unusual noises on the night of February 11th; her gate had been knocked down and there were suspicious

footprints in her yard. Officer Belle testified on rebuttal, over defendant's objection, that he and several other officers made a thorough examination of the area surrounding the Schiers residence and found no strange footprints and no indication of forcible entry. The objection was properly overruled. The purpose of the officer's testimony was to dispel the inference, to be drawn from Mrs. Allen's testimony, that a prowler had been in the neighborhood at the approximate time Mrs. Schiers was murdered. It was properly introduced to rebut the case for the defense.

There is no substance to the assignments of misconduct urged under the fourth point.

■ The first instance of alleged misconduct by the court occurred during the direct examination of defendant. Counsel was inquiring as to the events of the evening of February 11th while defendant was alone in the house with Mrs. Schiers. After defendant stated that they had a "little tiff" about politics around 10 p. m. his attorney asked: "Well, that gets us into politics. After that did you leave the house?" Defendant replied: "That conversation stopped when I was mixing what I assumed would be the last drink of the fifth. As I poured it out, Mrs. Schiers was standing alongside of me and we were discussing Mr. Morley [a news analyst]." The court said: "I think the question is, did you leave the house." Defendant answered: "I am coming to that." Counsel said: "Let's come to it. Did you leave the house?" Defendant then testified that he went to the store and purchased a pint of scotch and some bottles of soda, as we mentioned earlier. Schiers contends that the court's statement was an improper restriction of his testimony on direct examination. We think not. It is clear from the foregoing that the court intervened solely in order to elicit a responsive answer to a question asked by defendant's own attorney. The court's action was proper and did not constitute misconduct.

■ The other instance of asserted misconduct occurred during the reexamination of the People's expert, Mr. Pinker. The deputy asked the witness: "And this test [the benzidine test] would show the presence of blood even though there was no blood visible to the naked eye?" Pinker replied: "So sensitive is it to blood that blood diluted 300 thousand times will still give the reaction. Amounts of blood that cannot be found with a microscope will give the reaction." The court then asked: "That is because of the presence of the hemoglobin?" Whereupon the witness gave an affirmative answer.

Defendant assigns the court's question as misconduct. There was no misconduct. The question was properly posed in an attempt to elucidate the testimony of the expert witness.

The next point to be considered is the insufficiency of the evidence to support the conviction. In this connection, defendant argues that the People's case was inherently improbable and that the circumstances in evidence were consistent with a theory of his innocence and inconsistent with a theory of his guilt. The argument cannot be maintained.

It was the opinion of the autopsy surgeon that Mrs. Schiers was murdered at some time between 10:30 p. m. on February 11th and 6:15 the following morning. Defendant admitted being at home with her until 5:30 a. m. when he left for work, except for a few minutes around 10:30 p. m. when he went to the store to buy liquor. A neighbor of the Schiers, Alex Tisdale, testified that he heard defendant's car drive away at 6:30 a. m. The defense expert, Dr. Johnson, a chemist and chemical engineer, placed the time of Mrs. Schiers' death at 7 in the morning, basing his opinion upon the rate of cooling of her liver and the amount of alcohol in her blood, which was .04 per cent. Johnson was not a doctor of medicine and he admitted never having performed any experiments on the liver cooling rates of deceased persons.

The resolution of conflicts in the testimony of the expert witnesses was a matter for the jury. (*People* v. *Tucker*, 88 Cal.App.2d 333, 340 [198 P.2d 941].) The jury could properly infer that defendant was in the house at the time of his wife's death. And in view of the foregoing, and of the fact that defendant heard no commotion during the night the jury could also infer that no person other than defendant could have committed the crime without detection.

The jury had further to consider the damaging evidence respecting the benzidine tests. Defendant assails the testimony of Lieutenant Jones as being false and contradictory, but the weight to be given to his testimony was a question for the trier of fact, not for a reviewing court. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778].) The tests made by Jones and Pinker established that there was blood in defendant's washbasin and commode and a heavy concentration of blood on his hands; more blood was distributed evenly on his arms, chest and legs.

It was a proper inference and, we believe, a necessary one, that Schiers had attempted to wash a considerable quantity of blood from his body. Defendant suggests in his briefs that

the blood could be accounted for by a shaving cut. This is obviously an afterthought, for when questioned by the officers, he denied having cut himself. Defendant admitted retiring to his wife's bedroom around 1 a. m., leaving his underclothes on the floor, and, as we mentioned earlier, his undershirt was found to be stained with blood. How Schiers came to have blood on his person was a fact within his own knowledge, yet he testified that he could not explain it. The jury was warranted in drawing the inference that he gave no exculpatory explanation because he had none to give. (*People* v. *Bowlby,* 135 Cal.App.2d 519, 528 [287 P.2d 547, 53 A.L.R.2d 1147], and cases cited.)

No reason is advanced by appellant, nor does the record disclose a reason, for doubt as to the accuracy or reliability of the scientific tests which disclosed the blood stains upon appellant's body and elsewhere, nor as to the competency or the credibility of the witnesses who made the tests. This evidence, if given full effect by the jury, was little short of conclusive as proof of appellant's guilt. There was no other reasonable explanation of Mrs. Schiers' death.

Schiers' sixth point is that his attorney was ill during the trial and was unable to defend him adequately. It is his contention that the court should have postponed the proceedings upon being advised of counsel's illness and that the inadequate representation by his attorney deprived him of a fair trial.

The trial lasted 10 days, of which five days were actually spent in the trial of the cause. Just before the noon recess on the first day of testimony, July 8, the court stated to the jury: "Ladies and gentlemen, you probably noticed that Mr. Eagan had a little accident over the weekend and he has had quite a loss of blood. So I am going to recess until tomorrow morning so that he may get home and get some rest." On the afternoon of the next day, July 9, following the direct examination of the autopsy surgeon, the court asked defendant's attorney how he felt and Mr. Eagan replied: "I was just going to ask the Court if he would mind if I sat down while I examine Dr. Newbarr. I am running a little out of gas, but I will be able to proceed."

Another incident occurred on the third day of trial, July 10. After the noon recess, Mr. Eagan stated to the court that he had "no recollection" of the last 15 minutes of the morning's proceedings, that he vaguely recalled Officer Belle taking the stand, and that he was not informed until adjournment

that the witness had testified regarding the conversation about a lie detector test to which we have already referred. Upon granting defendant's motion to strike this testimony, the court inquired whether counsel felt well enough to continue; Eagan said that he did. Later that afternoon, the court asked counsel whether he would be well enough to proceed the next day, and upon receiving an affirmative answer, the court ordered a recess until the following morning. We have set forth both colloquies in the margin.[1, 2]

■ When it is claimed on an appeal in a criminal case that the accused was inadequately represented by counsel at the trial, the question is whether he was substantially denied his constitutional right to be represented by counsel, and the mere fact that he may have received poor advice from his attorney is not a sufficient ground for disturbing the judgment. (*People* v. *Logan*, 137 Cal.App.2d 331, 335 [290 P.2d 11].) ■ Before it can be said that the right to counsel has been abridged, it must be shown that the representation afforded the accused was of so low a degree of competence

---

[1]'THE COURT: Let me ask you, do you feel well enough to continue with the trial? MR. EAGAN: I feel that I am well enough to proceed to the extent of cross-examining Sergeant Belle, which cross-examination will be short and then after the further proceedings, I would like to propose to the Court to accede to the taking of the testimony of character witnesses. I have four short witnesses who will merely testify to the defendant's character. THE COURT: I will be glad to go along as long as you think you are well enough, so that will have to come from you. MR. EAGAN: I am quite certain I am well enough to proceed. The presentation of the character evidence is a routine matter and I believe I will be able to proceed, although, as I informed the Court, during the noon hour I had another blackout period. THE COURT: Yes, you told me that informally and I want to state that at any time you feel weak, let me know, and we will recess the court until tomorrow or until next week to insure the defendant having all your abilities to defend him. MR. EAGAN: Thank you, your Honor. I am prepared to proceed and I will be prepared to proceed tomorrow morning. THE COURT: If you don't feel well, either this afternoon or tomorrow morning, or any time, I will have your witnesses come back and we will recess.''

[2]'THE COURT: I want the record also to show, Mr. Eagan, if you don't feel up to it and you are the only one that can tell us, because we can't determine how you feel, if you don't feel well enough so that you can adequately represent your client and examine the witnesses, because I understand you are going to have an expert here and then I take it from your voir dire examination you are going to put the defendant himself on the stand—MR. EAGAN: Yes, your Honor. THE COURT: If you don't feel up to it, it is your duty to tell us. It is your duty to your client, and your duty to the Court and to the Bar that you tell us about it. MR. EAGAN: I most certainly will. I am quite certain I will be all right tomorrow. THE COURT: May I suggest that you go home and eat a good beef steak and rest? MR. EAGAN: I am going to do that and peruse the transcripts at the same time.''

that the trial became a farce and a mockery of justice. (*People* v. *Dupree,* 156 Cal.App.2d 60, 69-70 [319 P.2d 39].)

Defendant has made no such showing here. A reading of the transcript leaves us in no doubt that Schiers received an able and vigorous defense. The cross-examination of the autopsy surgeon and the police technicians was extensive and searching. There is no substance to Schiers' assertion that he was inadequately represented at the trial.

The final point to be considered is that the court committed error in giving an instruction relating to accusatory statements. The instruction stated that the failure to reply to an accusatory statement may be considered as indicating an admission that the accusation was true, and that while the failure to reply would not be. sufficient to prove guilt, it was to be considered as a circumstance tending to prove a consciousness of guilt.

Officer Belle testified that he asked Schiers on several occasions whether he killed his wife and Schiers denied his guilt. On another occasion, defendant replied: "My lawyer told me not to say anything to you." Sometime in March, Belle asked him what he did with the money he borrowed from the bank and defendant answered that "he didn't want to answer any questions and his lawyer had told him not to answer any questions about what he did with the money, or what happened to it."

There was no occasion for an instruction on accusatory statements and none should have been given. Although it was error to give the instruction there was strong evidence of defendant's guilt and we are convinced that the error did not result in a miscarriage of justice. (*People* v. *Tuthill,* 31 Cal. 2d 92, 101-102 [187 P.2d 16]; *People* v. *MacEwing,* 155 Cal. App.2d 117, 130 [317 P.2d 82].)

After giving consideration to the many claims of error in the trial, we have found no disregard of defendant's right to a fair trial.

The judgment and order appealed from are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 11, 1958. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted. On August 7, 1958, Carter, J., filed the following opinion:

CARTER, J.—I dissent from the order denying a hearing in this case.

Rule on Appeal 29(a) declares: "A hearing in the Supreme Court after decision by a District Court of Appeal *will* be ordered (1) where it appears necessary to secure uniformity of decision or the settlement of important questions of law. . . ." (Emphasis added.) A hearing of the case should have been granted for both reasons because the prosecution introduced evidence of a lie detector test before the jury.

Officer Belle was the last witness in the prosecution's case in chief. He was asked: "Did you at any time ask him [defendant] about the benzedrine showing up blood on his skin?" Belle related an interview with defendant. During this he said: "On the night of February 12th, we had taken him to the Police Administration Building and gave him a lie detector test and told him that the test indicated that he was lying and asked him if he could explain that, and he said, 'No, there was something wrong with the machine.'

"When we first asked him to take the test, he was agreeable to take it. So Lietenant [sic] Putty explained the test to him and asked him to pick out a card with a number on it, and when he was asked what the number was, he was to lie about it and the machine indicated he was lying.

"*So Mr. Schiers felt that the test was a fair one* and agreed to take it. We told him that the test indicated that he was lying, and he said that he couldn't understand it, even though *he believed it was accurate* when they showed him the experiment. He couldn't understand why it indicated that he was lying when they asked the questions about the murder of his wife." (Emphasis added.)

The trial judge ordered the noon recess at this point. Upon resumption of the trial the judge admonished the jury "not to consider or even recall" Belle's testimony regarding the lie detector. The District Court of Appeal held that the admonition obliterated the error. An admonition may cure minor error. But to hold that an egregious and shocking attack upon the integrity of an accused is blotted out of a juror's mind by a mere incantation is as fictional as John Doe. (*People* v. *Lyons,* 47 Cal.2d 311 [303 P.2d 329]; *People* v. *Aragon,* 154 Cal.App.2d 646 [316 P.2d 370]; *People* v. *Wochnick,* 98 Cal.App.2d 124 [219 P.2d 70]. This error surpasses that in Lyons.)

This "error" was deliberately committed at the end of the prosecution's case. Behind it were the prestige of science,

the glamour of a modern scientific testing device, with the immense publicity given the "lie detector" in mass communication media. (See *People* v. *Aragon, supra,* at p. 658.) No expert testified as to the accuracy of the instrument, nor was the jury permitted to draw its own inferences from the questions asked during the test and the reaction of the instrument. The interpreter of the test may have been anybody, although this requires extensive training.[1] In fact, Belle did not testify to the *test results*; he merely testified that defendant was told it was unfavorable to him, leaving an obvious inference to the jury. A poll of jurors who sat in a case in which lie detector evidence was received (*People* v. *Kenny,* 167 Misc. 51 [3 N.Y.S.2d 348]) shows they were greatly influenced by the evidence.[2] I, therefore, conclude that the admonition was impotent before such powerful testimony. (*People* v. *Aragon, supra,* 154 Cal.App.2d 646; *People* v. *Wochnick, supra,* 98 Cal.App.2d 124.)

One would be credulous indeed to believe the prosecutor was surprised by Belle's revelation (see *People* v. *Aragon, supra,* 659). Both knew that such evidence is inadmissible. The theory of separation of powers enjoins the judiciary to restrain the excesses of the executive (Montesquieu, *Spirit of Laws,* Book 5, ch. 10; Book 6, ch. 6; *The Federalist* No. 48; see Griswold, *The Fifth Amendment Today,* p. 76, which indicates these fears are justified. *Contra:* Vyshinsky, *The Law of the Soviet State,* p. 498: "The bonds joining court and prosecutor's office are of the closest possible character and they act united by an indissoluble and organic bond.") By this decision the California judiciary invites repetition of such open debauchery of basic fairness to the discredit of bench and bar. In my opinion it amounts to a denial of due process of law.

This case breaks the uniformity of California decisions holding that an admonition to ignore the prosecution's evidence of lie detector tests is powerless. (*People* v. *Aragon, supra;* *People* v. *Wochnick, supra.*) The facts in the Wochnick case are identical with the instant one. These cases appear irrecon-

---

[1] Lack of training increases the incidence of error precipitously. McCormick, *Evidence* 373 (1954).

[2] This is the only such poll found. Defendant was found innocent. To the question: "Was the 'lie detector' testimony, in your opinion, *conclusive* proof of the innocence or guilt of Kenny?" six answered "yes," four "no." Two jurors did not respond to the poll. Forkosch, *The Lie Detector and the Courts,* 16 N.Y.U.L.Q. Rev. 202, 228-229 (1938-1939).

cilable. *People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665], held that the results of lie detector tests are not judicially recognized as accurate and therefore are not probative. After reversal, Carter was retried and acquitted. *People* v. *Porter*, 136 Cal.App.2d 461 [288 P.2d 561], affirmed the refusal of the trial court to permit defendant to take a lie detector test because such evidence had been held inadmissible in California criminal prosecutions. *People* v. *Houser*, 85 Cal.App.2d 686 [193 P.2d 937], affirmed a conviction based on such testimony because defendant stipulated to it in writing and expressly waived his privilege against self-incrimination. Twenty-one reported cases from other states have passed upon the admissibility of evidence of various "lie detector" devices to gauge the veracity of an accused. Not one appellate court has approved admission of such evidence. It was admitted as evidence on behalf of a defendant (*People* v. *Kenny, supra,* 167 Misc. 51 [3 N.Y.S.2d 348]), and was admitted for the sole purpose of proving a confession voluntary in *Tyler* v. *United States,* 193 F.2d 24. In only five of the 21 cases was it offered by the prosecution. In the others it was offered by the defense. California now becomes the first jurisdiction to affirm a successful prosecution. employing lie detector evidence.

Since the error was prejudicial because of its impact on the jury, the judgment of conviction should be reversed even though other evidence clearly established defendant's guilt. The testimony in issue violated defendant's privilege against self-incrimination (Cal. Const., art. I, § 13) and his right to a fair trial (U.S. Const., Fourteenth Amendment; Cal. Const., art. I, § 13). When constitutional liberties are impaired, article VI, section 4½, is powerless to cure the error. (*People* v. *Sarazzawski,* 27 Cal.2d 7 [161 P.2d 934], citing opinion of Sloss, J. in *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042].)

The privilege against self-incrimination extends to informal proceedings. (*People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18]; *Bram* v. *United States,* 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568].) Whether forcing a suspect to submit to a lie detector test violates this privilege has not received judicial scrutiny. In *People* v. *Trujillo,* 32 Cal.2d 105 [194 P.2d 681], this court held that only *testimonial* evidence was privileged, relying upon Wigmore, *Evidence,* section 2263, for this interpretation. Is evidence of a lie detector test *testimonial*? In Trujillo, the court said *testimonial* means evidence from one's own lips (p. 112). Wigmore, however, contended the

privilege existed only in formal proceedings where this form of expression is alone practical. In an out of court situation, other forms of communication must be included, for example, written records. (*United States* v. *Wheeler*, 149 F. Supp. 445.) Holmes used the term *communication*, which is broader. (*Holt* v. *United States*, 218 U.S. 245, 252-253 [31 S.Ct. 2, 54 L.Ed. 1021].) Wigmore defined testimonial evidence as ''. . . the assertions of human beings regarded as the basis of inference to the propositions asserted by them. . . .'' All other evidence is circumstantial. (Wigmore, *The Science of Judicial Proof* (3d ed. 1937), p. 12.) This would seem to mean that a fact observable to anyone, such as a person's footprint, his appearance, his handwriting, or his blood type, is circumstantial. But if one must rely on another's assertions to establish a fact it is testimonial. For example, did X shoot Y outside the interrogator's presence? The memory and perception of X are relied upon for a response. This is true when a lie detector is used, although it is not necessary for the accused to make a verbal reply to a question to produce a reaction in the machine. (Inbau, *Self-Incrimination* (1st ed.), pp. 67-68.) In essence, although the device records only objective physiological data, the ultimate source of that data is the nervous system of the accused.[3] This was the rationale of the holding in *People* v. *Harper*, 115 Cal.App.2d 776, 779 [252 P.2d 950]. The machine is a new and artificial method of communicating thought.

But the true question is: *Should* this evidence be within the scope of the privilege? Certainly it must be excluded until it is generally regarded as accurate. It is not now so regarded. (*People* v. *Davis*, 343 Mich. 348 [72 N.W.2d 269, 281]; *Henderson* v. *State*, 94 Okla. Crim. 45 [230 P.2d 495, 501,

---

[3]Accord: Wigmore, *Professor Muensterberg and the Psychology of Testimony*, 3 Ill.L.Rev. 399, 420; Sell, *Deception Detection and the Law*, 11 U.Pitt.L.Rev. 210, citing the same point 28 Ill.B.J. 308. Cases in accord: *Henderson* v. *State*, (94 Okla.Crim. 45) [230 P.2d 495, 502, 23 A.L.R.2d 1292]; *People* v. *Boeche*, 151 Neb. 368 [37 N.W.2d 593, 597]. Some writers disagree: McCormick, *Deception Tests and the Law of Evidence*, 15 Cal.L.Rev. 484, 520. He analogizes a polygraph, which measures physiological factors, to footprints and other objective evidence. But truth serum tests are inadmissible since the accused's very words are to be used against him. Inbau, *Scientific Evidence in Criminal Cases*, 24 J.Crim.L. & Cr., 1140, 1151. But he says diagnoses must be accepted with utmost caution and reservation. *The Lie Detector*, 26 B.U.L.Rev. 264. He says the courts are justified in excluding such evidence, *op. cit.* 271. He agrees with McCormick on truth serum tests. Inbau doubts that the courts will accept the analogy to ''physical'' evidence and rule lie detector tests are not privileged. *Self-Incrimination*, page 67.

23 A.L.R.2d 1292]; Sell, *Deception Detection and the Law,* 11 U. Pitt. L. Rev. 210; 39 Cal. L. Rev. 439, 440 (citing Kiracofe, JAG J. 56 (June, 1948)). *Contra*: Inbau, *The Lie Detector,* 26 B.U.L. Rev. 264.) But assuming it is 100 per cent accurate evidence of these tests should be held within the privilege because its use violates the policy foundations of the privilege. (Inbau, *Self-Incrimination,* pp. 67-68; Green, *Can Science Legally Get the Confession,* 21 A.B.A.J. 808; Silving, *Testing of the Unconscious in Criminal Cases,* 69 Harv.L.Rev. 683; 37 Harv.L.Rev. 1138.) These are expounded in Wigmore, *Evidence,* §§ 2250-2251; Griswold, *The Fifth Amendment Today;* and Chafee, *The Blessings of Liberty,* pp. 184-209. Briefly they include these policies:

1. To stimulate law enforcement agencies to discover independent evidence to uncover offenders rather than resort to the inquisitorial examination of many persons.

2. To keep individuals free from police investigation and meddling unless there is probable cause to believe one has broken the law. (See Butler, J., *Sinclair* v. *United States,* 279 U.S. 263, 292 [49 S.Ct. 268, 73 L.Ed. 692].)

3. To preclude inquisitions into a person's private life by local "tyrants" for the purpose of "ensnarement." (See also Despres, *Legal Aspects of Drug-Induced Statements,* 14 U. Chi. L. Rev. 600, 607.)[4]

4. Dependence upon confession at trials.

5. Assuming the detector becomes 100 per cent accurate and its results are admissible, the jury will become vestigial and the defendant will no longer be a "party" since he cannot make a realistic defense. The real case will be decided not in open court but in the laboratory. (See: Silving, *Testing the Unconscious in Criminal Cases,* 69 Harv. L. Rev. 683, 701; Kaganiec, *Lie-Detector Tests and "Freedom of the Will" in Germany,* 51 Nw. U.L. Rev. 446.)

The lie detector is offensive to the traditions of our law. Germany's highest court reversed a conviction obtained with the aid of lie detector evidence. It held that it violated the principle of the Constitution that "Man's dignity is invio-

---

[4]Inbau, *Scientific Evidence in Criminal Cases,* 24 J.Crim.L. & Cr., 1140, reports certain banks give periodic lie detector tests to employees and a background detector test for prospective employees (1144). He also reports a successful inquisition in a dormitory theft case (1146). See also *McCain* v. *Sheridan, ante,* p. 174 [324 P.2d 923]. Loyalty tests and general "criminal examinations" are conceivable in the near future. For a critique, see Orwell, *1984.*

late." (Reported by Silving, *op. cit. supra,* 688.) The historical antecedent of this Constitution is remarkably like that which produced the privilege in our own tradition. On April 10, 1958, Pope Pius XII condemned the use of narcoanalysis and lie detectors by police to extract confessions from suspects as illicit. (Address to 13th International Congress of Applied Psychology reported by Professor G. Zilboorg, M.D., in *America,* June 7, 1958, p. 308.)

Although Schiers consented to the test in the instant case, he cannot be held to have waived his immunity. Belle testified that the police convinced Schiers of the machine's accuracy. Assuming he was guilty, he did waive the privilege. Assuming he is innocent, he did not. It was observed that the machines are not fully accurate, particularly without expert operation. (McCormick, *Evidence,* p. 373.) An innocent man, convinced of the device's accuracy, would anticipate a favorable result, not an involuntary admission of guilt. He cannot be held to have waived his privilege against an untruth. Incriminating evidence obtained by deceit is within the privilege (*United States* v. *Wheeler,* 149 F. Supp. 445; *People* v. *Leyra,* 302 N.Y. 353 [98 N.E.2d 553]). Of course, no one but Schiers knows if he killed his wife.

The "confession" via the lie detector was so unfairly obtained and presented as to taint the entire proceeding within the test prescribed in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. Although it was not the usual confession expressed vocally or in writing, it was tantamount to one. Belle in effect told the jury that Schiers' perception and memory caused a physical reaction recorded by the lie detector, and that it indicated Schiers' verbal denial of guilt was a lie. If the jury believed the instrument to be accurate as Belle tacitly implied it was, they must have interpreted it as an acknowledgment of guilt.[5] It made precisely the same impression on the jury as a confession. Defendant, without counsel, was convinced that the detector was an accurate device. There is no evidence that an expert administered the test. There is no statement that the machine indicated Schiers was lying, although Belle's chronicle conveyed to the jury this impression. Belle only said Schiers *was told* the machine showed he was lying. This

---

[5]Chafee says the lie detector is so complex and the testing and interpretational methods so specialized, that a jury may have to undergo an I. Q. test before it is permitted to draw inferences from evidence of the tests. *The Progress of the Law 1919-21,* 35 Harv.L.Rev. 302, 309.

is often done to "break down" a suspect to confession. The impact on the jury was that the questions asked during the test, the verbal replies, and the infallible lie detector bared Schiers' consciousness and revealed guilt. An innocent defendant relying on the device would expect it to exculpate him, not condemn him. If Belle was deceitful, the officers did not tell Schiers the true results,[6] or the test was inconclusive, as about 20 per cent of them are. (See Inbau, *The Lie Detector*, 26 B.U.L. Rev. 264, 268.) "Voluntary" confessions obtained after such tests are admissible. (*State* v. *Dehart*, 242 Wis. 562 [8 N.W.2d 360]; *Webb* v. *State*, (Tex. Crim.) 291 S.W.2d 331; *Henson* v. *State*, (Tex. Crim.) 266 S.W.2d 864; *Commonwealth* v. *Hipple*, 333 Pa. 33 [3 A.2d 353]; *Tyler* v. *United States*, 193 F.2d 24. *Contra: People* v. *Sims*, 395 Ill. 69 [69 N.E.2d 336].) However, Schiers has always maintained his innocence. Evidence obtained by misrepresentation is constitutionally excludable (*United States* v. *Wheeler, supra,* 149 F. Supp. 445). The sum total of fairness and trustworthiness in this sort of evidence, when impressed upon a jury, is on a par with the old shell game.

Further, no expert appeared to testify to the precautions taken to insure the accuracy of the test or to interpret the machine's reactions. The jury did not hear the questions asked Schiers, his answers, or the degree to which the test was conclusive or what inferences could be drawn from the test. The jury was only told that the lie detector found Schiers guilty. Defense counsel, properly fearing the effect on the jury of the reiteration of this evidence, did not cross-examine on this point.

For these reasons a hearing should have been granted and the judgment of the trial court reversed.

Schauer, J., concurred.

---

[6]The instrument is not in the examinee's view during the test.